**UNITED STATES of America, Appellee,**

v.

**Jack Randall MacCLOSKEY, Appellant.**

**No. 81–5054.**

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 5, 1982.

Decided June 17, 1982.

Johnny S. Gaskins, Raleigh, N. C., for appellant.

David B. Smith, Asst. U. S. Atty., Greensboro, N. C. (Kenneth W. McAllister, U. S. Atty., Greensboro, N. C., Becky M. Strickland, Paralegal Specialist on brief) for appellee.

Before MURNAGHAN and SPROUSE, Circuit Judges, and MICHAEL,* District Judge.

MURNAGHAN, Circuit Judge:

On October 27, 1980, a three count indictment was returned in the United States District Court for the Middle District of North Carolina. Count One charged appel-

---

* The Honorable James Harry Michael, Jr., United States District Judge for the Western District of Virginia, sitting by designation.

lant Jack Randall MacCloskey and others [1] with conspiracy to murder a federal agent, Drug Enforcement Administration Special Agent Skaggs, in violation of 18 U.S.C. §§ 1114 and 1117. Count Two of the indictment charged MacCloskey and others (the same alleged coconspirators as in Count One) with conspiracy to obstruct the administration of justice by killing Steve Lansley, a potential government witness (by blowing him up with dynamite), in violation of 18 U.S.C. §§ 371, 1503 and 844(d).[2]

The case was tried before a jury which found MacCloskey guilty on both counts. After consolidating the two counts for judgment, the trial judge sentenced Mac-Closkey to twenty-five years imprisonment.

MacCloskey appeals his conviction raising a number of contentions. At oral argument, MacCloskey argued that the evidence was insufficient to establish a conspiracy under either count. In addition, MacCloskey urged that the district court's failure to admit prior testimony of a key defense witness, Patsey Elaine Edwards, was prejudicial error.

We have concluded that the evidence did not, as a matter of law, prove a conspiracy to kill Agent Skaggs, as alleged in Count One of the indictment. Although the evidence was legally sufficient to support the guilty verdict in Count Two (conspiracy to murder Lansley), the exclusion of Patsey Elaine Edwards' prior testimony and the presence of prosecutorial interference inducing her not to testify force us to grant a new trial on Count Two.

### A. The Evidence

Viewing the evidence in the light most favorable to the government, the following was proven at trial.

During January, 1980, Steve Lansley met MacCloskey in Rockford, Illinois, and discussed some marijuana which was coming into Chicago.[3] At that time, Lansley was a Drug Enforcement Administration informant. Lansley arranged a meeting between DEA Special Agent Skaggs and Mac-Closkey in Rockford to discuss drug transactions.

As a result, Lansley and Skaggs flew to North Carolina to purchase methaqualone (quaalude) tablets from MacCloskey. Upon their arrival in North Carolina, Lansley and Skaggs drove to a motel where they met Pete Honeycutt. Honeycutt accompanied Lansley and Skaggs to MacCloskey's farm outside of Troy, North Carolina. While there, Skaggs purchased 5,000 methaqualone tablets before he and Lansley left the farm. In late July, MacCloskey informed Lansley about the availability of cocaine.

In August, Lansley flew down to Florida and received a call from a female who identified herself as "Mom." She told him that she had the cocaine but that MacCloskey had not made his plane and would not arrive in Fort Lauderdale that day. Mac-Closkey called Lansley to tell Lansley that he had missed his flight and to go ahead with the cocaine purchase. After meeting "Mom" and Miquel Vedaurre at a shopping center, Lansley was brought to a condominium where he tested three kilo bundles of cocaine and marked them for identification.

The next day, August 8, 1980, DEA Agents Skaggs and Mann arrived with the money. MacCloskey and Vedaurre arrived at the hotel where Skaggs and Mann were staying and were shown the money. Mac-Closkey went outside and returned with the three bundles of cocaine initialed by Lansley the day before. After the delivery of the cocaine, MacCloskey and Vedaurre were arrested by the agents.

Melvin (Pete) Douglas Honeycutt, a government informant, testified that he had known MacCloskey and MacCloskey's girlfriend, Patsey Elaine Edwards, for

---

1. The other indicted alleged co-conspirators were Patsey Elaine Edwards, Robert Hicks, Latisha Anderson (a/k/a "Mom"), and Miquel Vidaurre. The indictments, against all except MacCloskey have been dismissed.

2. Count Three was dismissed by the judge at the close of the government's case. The dismissal has not been appealed.

3. Unless otherwise indicated, all events occurred in 1980.

about a year and half. In late May, 1980, at MacCloskey's request, Honeycutt introduced MacCloskey to a Hell's Angel called "Ronny" at Honeycutt's gun shop in Charlotte, North Carolina. Thereafter, MacCloskey sold quaaludes to the Hell's Angels with Honeycutt acting as the middleman.

A day after MacCloskey's arrest for the cocaine sale, Edwards called Honeycutt and advised him that Steve Lansley was an informer and "Danny" was a DEA agent.[4] She told Honeycutt that MacCloskey and Mike [Vedaurre] had been arrested in Florida on a cocaine buy and she warned Honeycutt against talking to anyone. Later that day, Honeycutt went to Edwards' residence to bring her the money he had obtained from a quaalude sale to the Hell's Angels. While Honeycutt was there, MacCloskey called from jail and told Honeycutt that Lansley was an informer and Skaggs was a DEA agent. MacCloskey warned against talking to anyone.

On August 10, 1980, Honeycutt was approached by Alcohol, Tobacco and Firearms Special Agent Jerry Pistole whom Honeycutt had known since 1975. Agent Pistole told Honeycutt that he knew of Honeycutt's association with MacCloskey and asked if Honeycutt would cooperate with the DEA and ATF. Honeycutt agreed.[5]

On August 13, MacCloskey went to Honeycutt's store to ask Honeycutt to get in touch with the Hell's Angels and see if they could do something about Lansley. Venting his anger, MacCloskey said that he would like to kill Lansley personally.

On August 16, Honeycutt testified that he went to Edwards' house. She reiterated that Lansley was an informer and said she wanted something done about it. She asked Honeycutt if he could get in touch with the Hell's Angels. She found a picture of Lansley and MacCloskey together. Cutting the picture in half, she gave Honeycutt the Lansley portion.

On August 26, Honeycutt went to Edwards' residence. Edwards, MacCloskey and another couple were present. MacCloskey took Honeycutt aside. Very agitated, he told Honeycutt "I've got to kill a cop." MacCloskey discussed the possibility of making a "contract" on Lansley and Skaggs.

On August 27, Honeycutt telephoned MacCloskey and inquired whether MacCloskey was really serious about the contract. MacCloskey replied in the affirmative. Later that evening, MacCloskey came by Honeycutt's shop and informed Honeycutt that there had been a $30,000 "reward" put up in Florida ($15,000 for Skaggs and $15,000 for Lansley). The reward required that the killings take place so the bodies could not be recovered.

On August 29, Honeycutt called Edwards and asked her if she remembered giving him the half photo depicting Lansley and whether she would like to meet with someone who could handle the matter. She said she remembered the picture but that she didn't want to meet with anyone. She told Honeycutt he should talk to MacCloskey about it.

On August 31, Honeycutt went to Edwards' house at MacCloskey's request. In Edwards' presence, MacCloskey mentioned that he was concerned about the half photo falling into unfriendly hands. Honeycutt assured him that there was no need to worry. Honeycutt asked whether MacCloskey had a better photo of Lansley since the half picture was not very good. MacCloskey took a picture of Lansley out of his briefcase and told Honeycutt to give it to the Hell's Angels.

The next morning Honeycutt met Edwards and MacCloskey for breakfast. MacCloskey again expressed concern over the half photo of Lansley turning up. Since Edwards had told Honeycutt not to say anything to MacCloskey when she first gave the half photograph to him, Honeycutt assured Edwards that he had not said anything to MacCloskey about it. She respond-

---

4. Agent Skaggs' cover name was Danny Sims. Skaggs was known to Honeycutt as "Grady."

5. Thereafter, Honeycutt contacted Pistole whenever anything happened. Often, Honeycutt would, at Pistole's direction, tape conversations.

ed that it was all right since Edwards and MacCloskey had already discussed it. MacCloskey mentioned that he trusted Edwards.

Honeycutt testified that Edwards was present when they began talking generally about the "contract." The specific topics of the conversation, however, were not mentioned in the testimony. After breakfast, he and MacCloskey drove to Edwards' house in one car and she left in her own car. At the house, MacCloskey talked about using explosives so that no trace of the bodies could be found.[6]

On September 2, MacCloskey gave Honeycutt a picture of Agent Skaggs. MacCloskey first cut out the background of the picture with a pocketknife so that tracing the picture back to him would be impossible.

On September 6, Honeycutt told MacCloskey that the alleged hitmen were in Chicago. Honeycutt reminded MacCloskey that killing a federal agent was a serious offense. Undaunted, MacCloskey wanted to proceed. MacCloskey promised that the hitmen would get their money, but he wanted a picture as proof that the job was done.[7] Fearing that Edwards might be a weak link, MacCloskey admonished Honeycutt not to talk about the contract in front of her anymore.

Since the beginning of September, Honeycutt had informed MacCloskey that a downpayment would be necessary. Although reluctant, MacCloskey finally agreed to putting up collateral on September 13. On that day, he delivered a Star Light scope (estimated value $7,000) and an ivory statue (estimated value $18,000) to Honeycutt. Later Honeycutt called Edwards and asked her whether she would be willing to part with the scope and ivory piece if they were acceptable to Honeycutt's "friends." She said she would if the price was right.

Contact continued between MacCloskey and Honeycutt during the middle of September concerning the contract. In particular, the acquisition of dynamite for the job and the source of the award money were the prime topics of conversation during the period.

On September 28, MacCloskey asked Honeycutt to meet him at Edwards' house. When Honeycutt arrived, MacCloskey took out of his truck a box containing five sticks of dynamite and a bag of blasting caps. MacCloskey placed the items in the trunk of Honeycutt's car. After the transfer, they went into the house. Shortly thereafter, Edwards came home. In Edwards' presence, MacCloskey told about how he had talked "Mom" into placing the contract through Honeycutt to the Hell's Angels and how he convinced her to boost the reward. He stated that he had been in touch with "Mom's" attorney. MacCloskey was anxious for the contract to be carried out as soon as possible.

All the while Honeycutt was in constant contact with Agent Pistole. The federal agents decided that the best way to handle the matter was to feign the murder of Lansley and Skaggs. On October 6, two federal agents posing as motorcycle hitmen met MacCloskey at Honeycutt's shop. They showed him four photographs depicting the alleged demise of Skaggs and Lansley which had been staged for MacCloskey's benefit. MacCloskey was delighted by the evidence of their apparent deaths. Later that day, MacCloskey told Honeycutt that he would give Edwards the details of the murders. During the next several days MacCloskey made efforts to secure the contract money from Mom. MacCloskey told the federal agents, who were masquerading as hitmen, that Mom was the person who would make the payoff. MacCloskey was arrested by the agents on October 10.

### B. Denial of Defendant's Motion for Judgment of Acquittal

MacCloskey moved for a judgment of acquittal pursuant to Rule 29 of the Federal

---

**6.** Honeycutt testified that the use of explosives was discussed when Edwards was with them.

**7.** The total amount of the contract was $30,000: $15,000 for Skaggs, $10,000 for Lansley and $5,000 for Honeycutt's involvement.

Rules of Criminal Procedure at the close of the government's case, at the close of all the evidence, and again after the jury was discharged. The motions were denied. MacCloskey asserts that they should have been granted because the evidence was not sufficient to sustain the conspiracy counts. Specifically, MacCloskey argues that there was no evidence of an agreement between at least two persons to commit the crime.

■ The test for deciding a motion for a judgment of acquittal is whether there is substantial evidence (direct or circumstantial) which, taken in the light most favorable to the prosecution, would warrant a jury finding that the defendant was guilty beyond a reasonable doubt. *See United States v. Dominguez*, 604 F.2d 304, 310 (4th Cir. 1979), *cert. denied*, 444 U.S. 1014, 100 S.Ct. 664, 62 L.Ed.2d 644 (1980); *United States v. Stroupe*, 538 F.2d 1063, 1066 (4th Cir. 1976). Under that test, the evidence convicting MacCloskey of conspiring to murder Special Agent Skaggs was insufficient and we reverse as to that count.[8] There was, however, sufficient evidence that Edwards and MacCloskey conspired to murder the DEA informant, Steve Lansley.

■ The judge submitted the case to the jury on the theory that MacCloskey's girlfriend, Patsey Elaine Edwards, was the only possible co-conspirator. Although the government argued at trial and on appeal that other people were involved, we agree with the trial judge's determination that, if any conspiracy existed, it was between Edwards and MacCloskey.

Only the most tenuous circumstantial evidence links Edwards to the alleged conspiracy to kill Special Agent Skaggs. She may have had an interest in the ivory, which was allegedly put up as part of the collateral for the downpayment for both murders. No evidence was presented, however, that she knew there would be *two* murders. She was present on at least two occasions when MacCloskey and Honeycutt were discussing the "contract." No evidence of record establishes that the contemplated murder of Skaggs was specifically discussed on those occasions.[9] It would only be speculation, unsupported by evidence, that Skaggs' murder was ever discussed in her presence. It would require pure conjecture on the part of the jury to find that a conspiracy to kill Skaggs existed between MacCloskey and Edwards, and that she knowingly and voluntarily participated in it.[10] *United States v. Laughman*, 618 F.2d 1067, 1075 (4th Cir. 1980), *cert. denied*, 447 U.S. 925, 100 S.Ct. 3018, 65 L.Ed.2d 1117 (1980). Accordingly, we reverse MacCloskey's conviction on Count 1. *See United States v. Stroupe*, 538 F.2d 1063, 1066 (4th Cir. 1976).

■ The evidence is substantial enough to sustain a conviction, although by no means overwhelming, that MacCloskey and Edwards were involved in a conspiracy to kill Steve Lansley. Certainly, Edwards wanted Lansley killed when she gave Honeycutt the half picture of Lansley on August 16 and asked Honeycutt to get in

---

**8.** There was no charge of attempt brought against MacCloskey.

**9.** MacCloskey expressed an intention to tell Edwards about both "murders." However, that standing alone is just too slight to show a conspiracy as to Skaggs' supposed murder. Simply being told that something has happened, without other evidence that one had endeavored to bring it about does not constitute one a participant. *See United States v. Diaz*, 655 F.2d 580, 584 (5th Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 1257, 71 L.Ed.2d 448 (1982) (" '[It] is elementary that neither association with conspirators nor knowledge of illegal activities constitute proof of participation in a conspiracy.' ") (Citations omitted).

**10.** Although MacCloskey told Honeycutt he trusted Edwards, nevertheless, when the plan approached its final steps, MacCloskey warned Honeycutt not to tell Edwards anything because he feared she was a weak link.

Even if it were shown that MacCloskey and Honeycutt did, in fact, speak about the plot against Skaggs in her presence that would not change the result, absent clearer proof of an agreement between Edwards and MacCloskey. *See United States v. Dominguez*, 604 F.2d 304, 309 (4th Cir. 1979), *cert. denied*, 444 U.S. 1014, 100 S.Ct. 664, 62 L.Ed.2d 644 (1980) ("[E]vidence of mere presence or association is insufficient to support a conviction for conspiracy.").

touch with the Hell's Angels. Three days earlier, MacCloskey had made the same request. It was not until August 26, however, that MacCloskey ·expressed his desire to have Skaggs eradicated. When Honeycutt called Edwards on August 29 with reference to meeting some people who would take care of Lansley, she told Honeycutt she did not want to talk about it and she preferred that Honeycutt talk to Mac-Closkey about it. The inference, of course, is that by this time Edwards and MacCloskey had discussed the plot to kill Lansley, and that Edwards assigned to MacCloskey the lead role. The validity of the inference is augmented by MacCloskey's concern a few days later as to the whereabouts of the half photograph which Edwards had previously given to Honeycutt. Presumably he learned of that transaction from Edwards. At the breakfast on September 1, Edwards confirmed that she and MacCloskey had

discussed the half photo. During that meeting, MacCloskey and Honeycutt discussed the contract in Edwards' presence. Given the context of the discussion, it is a perfectly reasonable inference that they were speaking at the very least about Lansley.[11]

■ On September 6, MacCloskey was apparently having doubts about his previously expressed trust in Edwards because he told Honeycutt not to talk about the contract in front of her anymore. The jury could have inferred that Edwards was involved in the conspiracy from the testimony which showed that the piece of ivory was put up as collateral for the contract. Viewed in the light most favorable to the government, we think the evidence was sufficient to sustain a jury finding that Mac-Closkey and Edwards conspired to kill Lansley (Count 2).[12] However, as to Skaggs, at

---

**11.** It may even be inferred that, inasmuch as the "contract" extended to elimination of Skaggs as well, see note 7, *supra*, Skaggs' planned demise also was discussed by Mac-Closkey and Honeycutt before Edwards. Proof of any actual participation by Edwards in the Skaggs plot, however, is totally lacking. Being a bystander is not the equivalent of participation, see note 10, *supra*. Her participation in the Lansley conspiracy, on the other hand, is manifest by the half photo which Edwards delivered to Honeycutt and Honeycutt's testimony indicating that MacCloskey and Edwards had discussed the picture.

**12.** At oral argument, we inquired why the government chose the difficult route of proceeding against the defendant under conspiracy instead of seeking a state prosecution for the crime of solicitation. The government responded simply that a state prosecution was never seriously considered because the case was solely a federal investigation.

The facts of this case would seem to establish the North Carolina common law crime of solicitation to commit a felony. In *State v. Keen*, 25 N.C.App. 567, 571, 214 S.E.2d 242, 244 (1975), the North Carolina Court of Appeals, in a case factually similar to the case at bar, stated: "The crime of solicitation to commit [murder] is complete with the solicitation even though there could never have been an acquiescence in the scheme by the one solicited [an informer]." *See State v. Furr*, 292 N.C. 711, 720, 235 S.E.2d 193, 199 (1977), *cert. denied*, 434 U.S. 924, 98 S.Ct. 402, 54 L.Ed.2d 281 (1977) ("Solicitation of another to commit a felony is a crime in North Carolina, even though the solicitation is

of no effect and the crime solicited is never committed.").

Of course, solicitation to commit a felony was a misdemeanor at common law. *See State v. Jarvis*, 50 N.C.App. 679, 680, 274 S.E.2d 852, 852 (1981). North Carolina recognizes common law crimes. *See* N.C.Gen.Stat. § 4–1. North Carolina General Statute § 14–3(b) provides: "If a misdemeanor offense as to which no specific punishment is prescribed be infamous, ... the offender shall ... be guilty of a Class H felony." The punishment prescribed for such a felony occurring before July 1, 1981, is imprisonment for not more than ten years, a fine, or both. N.C.Gen.Stat. § 14–2.

Solicitation to commit murder has been held to constitute an "infamous" offense. *State v. Keen*, 25 N.C.App. 567, 571, 214 S.E.2d 242, 244 (1975). *See State v. Furr*, 292 N.C. 711, 725, 235 S.E.2d 193, 202 (1977), *cert. denied*, 434 U.S. 924, 98 S.Ct. 402, 54 L.Ed.2d 281 (1977) (upholding a felony sentence for a solicitation conviction).

It appears that under North Carolina law a determination that a misdemeanor is infamous affects only the punishment. The statute of limitations for misdemeanors in North Carolina is two years from the commission of the offense. N.C.Gen.Stat. § 15–1. The first time that MacCloskey approached Honeycutt about murdering Skaggs was August 13, 1980. Thus, a state indictment returned by August 13, 1982 would appear not to be time barred. No double jeopardy obstacle prevents the state from proceeding against MacCloskey even though federal charges were brought. *See Bartkus v. Illinois*, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959).

most awareness by Edwards, but not conspiratorial participation on her part was shown. To the extent Edwards did not conspire, neither did MacCloskey, since it was with Edwards that he conspired or no one.

## C. *Admission of Edwards' Prior Testimony*

Notwithstanding our determination that the evidence was sufficient to convict MacCloskey under the count alleging a conspiracy to murder Lansley, we are of the opinion that a new trial is required because MacCloskey was improperly denied the complete testimony of his major defense witness, Patsey Elaine Edwards.[13]

Edwards was originally indicted with MacCloskey and others for conspiring to murder Lansley and Skaggs. At the beginning of the trial, which commenced on January 19, 1981, the defense made known its intention of calling Edwards as a defense witness. Before trial, MacCloskey's attorneys were advised by the federal prosecutor that the indictment against Edwards would be dropped prior to the commencement of MacCloskey's trial. On January 21, 1981, the U. S. Attorney, David Smith, telephoned Edwards' attorney, Michael Greeson. In essence, Smith told Greeson that he would be well-advised to remind his client that, if she testified at MacCloskey's trial, she could be reindicted if she incriminated herself during that testimony. The attorneys defending MacCloskey were apprised of the conversation (presumably by Greeson) the same evening.

The next morning defense counsel brought the conversation containing Smith's warning to the attention of the trial court. Later that afternoon, Edwards agreed to testify out of the jury's presence in a *voir dire* hearing. She was warned of her *Miranda* rights by the trial judge before she testified. She nevertheless testified and was cross-examined by the U. S. Attorney. Reduced to its basics, her testimony was that she knew nothing about any scheme to kill either Skaggs or Lansley and that MacCloskey never discussed the matter with her. In short, the testimony contradicted Honeycutt's testimony of Edwards' involvement and was completely exculpatory of both her and MacCloskey. After the *voir dire* hearing, the indictment against Edwards was dismissed.

On January 26, the day the defense began its case, MacCloskey's counsel advised the trial court that they had been advised that Edwards might not testify on advice from an attorney identified as Gary Vannoy.

On January 27, defense counsel told the trial judge that they had been advised by Edwards and her attorney that Edwards would invoke her Fifth Amendment privilege. They requested a *voir dire* if she so invoked her rights. In addition, defense counsel requested that, if she refused to testify, her prior *voir dire* testimony be admitted pursuant to Fed.R. of Evid. 804.

The trial judge stated that if she invoked the Fifth Amendment he would not pursue the matter because he felt that he had no right to determine whether a person was properly pleading the Fifth Amendment. In addition, he refused to admit Edwards' prior testimony because it was his belief that a person's testimony was not "unavailable," as required by Rule 804, merely because the person has invoked the Fifth Amendment. Thereafter, Edwards was called to the stand by the defense and she answered many questions in the jury's presence but refused to answer some questions, invoking the Fifth Amendment.[14] She had

Obviously, nothing in our opinion prevents the federal officials from cooperating with the state authorities to secure an indictment against MacCloskey under state law. The possibility reduces the sense of uneasiness bred by the realization that, there being apparently no other applicable federal crime, MacCloskey, a thoroughly disreputable and evil man, might slip through the interstices of the web of the law and escape trial for his heinous behavior towards Skaggs.

13. MacCloskey did not testify.

14. She first invoked the Fifth Amendment when the defense attorney asked her to describe the circumstances surrounding her giving a picture (presumably of Lansley) to Honeycutt. She had, in the previous question,

testified in great detail to virtually identical questions at the *voir dire* held earlier that week and at that time she answered all the questions which she subsequently refused to answer at trial.

Before cross-examination by the prosecutor, *voir dire* was held. Edwards said that she truthfully testified at the *voir dire* earlier in the week. She testified that she nevertheless now was invoking the Fifth Amendment because she was afraid that her indictment would not be dismissed.[15] She stated she was not concerned about incriminating herself but was not testifying because her attorney told her that the U. S. Attorney's office suggested that she had "better remember the privilege of the Fifth Amendment." At that point, defense counsel moved for a mistrial on the ground that MacCloskey had been denied the use of his witness as a result of the prosecutor's call. In addition, defense counsel renewed their motion that the prior *voir dire* testimony be admitted pursuant to Rule 804. Both motions were denied. After the evidence closed, Edwards' former attorney, Michael Greeson, testified, out of the presence of the jury, concerning the details of the phone call he received from Mr. Smith.[16]

admitted giving him a picture. She then admitted having a conversation with him about the picture. She again invoked her rights in the next question when the defense attorney asked her again if she gave him the picture (a fact she had previously testified to).

Although admitting the accuracy of the tape recording of a conversation she had with Honeycutt in late August 1980, she refused to testify about the conversation. She next invoked the privilege concerning a conversation she had with MacCloskey and Honeycutt at breakfast on the first of September, 1980. She invoked the privilege when asked whether she was present when dynamite was transferred by MacCloskey to Honeycutt in late September 1980.

She testified that she had had a telephone conversation with Honeycutt in which she said she offered to sell her piece of ivory. She denied talking with anyone about using the ivory as collateral.

After testifying that a transcription of an October 6th telephone conversation between herself and Honeycutt was fair and accurate, she refused on Fifth Amendment grounds to relate just what that conversation was about.

She testified that: she neither had a conversation with anyone about killing Lansley or Skaggs (who she knew as "Danny") nor overheard any such conversation. She did hear the defendant say "he wanted to kill a cop." She stated that that statement was made at her house when Honeycutt and the defendant were talking. She testified that in response to that statement she told MacCloskey that he shouldn't say things like that because somebody might believe him. She denied ever asking Honeycutt to do anything to Steve Lansley.

She said that Honeycutt told her that he was in trouble with Lansley. She declined to answer whether: Honeycutt ever asked her for a picture of Lansley; whether she knew who Danny was; and whether she learned at some point that Lansley was an informant.

On cross-examination, Edwards invoked the Fifth Amendment on two questions concerning the half photograph. She refused to answer whether she had a conversation with Honeycutt in late August 1980. Although answering some questions, she also refused to answer four other questions on Fifth Amendment grounds.

15. This is an inaccurate statement on her part. Her indictment had been dismissed on January 22, about a week earlier. Nonetheless, her fear of reindictment lingered.

16. This colloquy followed:
MR. GREESON: Mr. Smith called me on Sunday afternoon prior to when this case was supposed to be called on Monday. He called me at home. He asked me if Patsey was going to testify and I told him I didn't know. He pointed out to me the possibility that if Miss Edwards made any statements she could be reindicted. He had already told me he was going to take a dismissal and I told him I understood that. He asked me if I had discussed with my client the Fifth Amendment and I said that I had. I don't remember much of the rest of the substance of it. I do remember that he brought up the Fifth Amendment.
THE COURT: He being whom?
MR. GREESON: Mr. Smith.
THE COURT: And what to your best recollection was that conversation?
MR. GREESON: Just that, Your Honor. That's about all I can recall. I did make some comment, and I asked him if it was a threat about her testifying and he said that it was not but that she'd best be advised of what the Fifth Amendment is and that she'd best be advised that if she made any statements that she was subject to being reindicted. Those statements, which would be in and of themselves statements which would allow him to proceed without the problems that he saw in the case before.
THE COURT: Mr. Greeson, by reason of the conversation that you had with Mr.

The defense sought to get Edwards' prior testimony (which was exculpatory to both her and MacCloskey) into evidence under Fed.Rule of Evid. 804. Rule 804(b)(1) provides:

> (b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> (1) Former testimony. Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

No dispute existed that the *voir dire* testimony could be admitted under the Rule if Edwards was found unavailable. Rule 804(a) defines unavailability as including situations in which the declarant:

> (1) is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of his statement; or
>
> (2) persists in refusing to testify concerning the subject matter of his statement despite an order of the court to do so.

\* \* \* \* \* \*

■ The district court refused to admit the prior testimony of Edwards on the erroneous ground that Edwards' invocation of her right against self-incrimination did not render her unavailable. The law is clear that a witness is unavailable under Rule 804(a)(1) when he invokes the Fifth Amendment privilege and the claim is sustained by the trial court. *See, e.g., United States v. Zurosky,* 614 F.2d 779, 792 (1st Cir. 1979), *cert. denied,* 446 U.S. 967, 100 S.Ct. 2945, 64 L.Ed.2d 826 (1980); *United States v. Toney,* 599 F.2d 787, 789–90 (6th Cir. 1979).

■ The Rule requires, however, that the court first rule the declarant exempt from testifying on the ground of privilege. We think the requirement was met when the district judge informed counsel that, if Edwards pleaded the Fifth Amendment, the judge "would not pursue it;" i.e. would allow Edwards to stand mute, because he thought he did not have the authority to determine whether she was properly invoking the Fifth Amendment. That view was also erroneous. *See, e.g., Roberts v. United States,* 445 U.S. 552, 560 n.7, 100 S.Ct. 1358, 1364 n.7, 63 L.Ed.2d 622 (1980) ("It is the duty of a court to determine the legitimacy of a witness' reliance upon the Fifth Amendment."); *United States v. Klauber,* 611 F.2d 512, 514 (4th Cir. 1979), *cert. denied,* 446 U.S. 908, 100 S.Ct. 1835, 64 L.Ed.2d 261 (1980) ("The right to invoke the Fifth Amendment as to any question put is not absolute. The trial judge in appropriate cases may determine that a foundation for invocation of the Fifth Amendment does not exist."); McCormick, *Handbook of the Law of Evidence* § 139 at 293 ("[T]he court itself has the obligation to determine whether the refusal to answer is in fact justifiable under the privilege.").

■ Arguing that a witness can be unavailable under Rule 804 only if he *properly* invokes the Fifth Amendment, the government contends that Edwards waived her Fifth Amendment privilege by virtue of her testimony during the *voir dire* and at trial.

---

Smith did you thereafter talk to Miss Edwards with reference to the substance of the conversation and if so what did you tell her?
MR. GREESON: I related the conversation to Miss Edwards and I told her basically what he had said. We discussed all of her alternatives at that point in time. I hesitate to go further, Your Honor. I believe that's between my client and I (sic) as to our discussions, but I certainly did apprise her of that telephone conversation that I had with Mr. Smith.

Mr. Smith noted that the call was on Wednesday, not Sunday, and stated:
The conversation with reference to Miss Edwards' testimony dealt solely with her incrimination so that we would be able to proceed—basically the same thing which was discussed in chambers last Thursday, that any statement she made which incriminated her could be the basis of a subsequent prosecution of her on this offense without the problem which arose requiring the dismissal of her case in the beginning.

*See Rogers v. United States,* 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344 (1951). We think the government is, as a general proposition, correct in asserting that a witness must properly invoke his Fifth Amendment right for him to be unavailable under Rule 804(a)(1).[17]

Nevertheless, we still think reversible error occurred. Assuming Edwards waived her Fifth Amendment privilege during either her *voir dire* testimony, her trial testimony or both,[18] the trial judge should have compelled her to testify.[19] If she still refused to testify after being or-

---

17. We could find only one case which overturned the admission of evidence under Rule 804 because the trial court erroneously upheld a witness' Fifth Amendment privilege. In *United States v. Mathis,* 559 F.2d 294, 298 (5th Cir. 1977), the court ruled that a witness who improperly invoked a privilege was not unavailable under Rule 804(a)(1).

The commentators suggest that the privilege must be properly invoked for a witness to be unavailable under Rule 804(a)(1). *See, e.g.,* 4 D. Louisell & C. Mueller, *Federal Evidence* § 486 at 1027–29. (Unavailability under Rule 804(a)(1) is established "where a witness properly claims his constitutional privilege against self-incrimination. . . . Where a claim of privilege by a witness is erroneously sustained, a finding of unavailability based thereon is also erroneous.").

Note, however, that the case does not fall within Rule 804(a)(2) because, instead of ordering Edwards to testify, the district judge made clear that he would not so order her. If we address the problem in terms of what should have been done, however, if the judge had ordered Edwards to testify, and she then refused, she would have been unavailable under Rule 804(a)(2). 4 J. Weinstein & M. Berger, *Weinstein's Evidence,* ¶ 804(a)[01] ("If the declarant refuses to testify . . . by erroneously relying on a privilege . . . he is rendered unavailable [under Rule *804(a)(2)* ].") (Emphasis added). *See United States v. Mathis,* 559 F.2d 294, 298 (5th Cir. 1977) ("[T]here is authority supporting the view that the witness who erroneously asserts a privilege and refuses to testify is rendered unavailable.") (dicta); *United States v. Mobley,* 421 F.2d 345, 350–51 (5th Cir. 1970) ("[The declarant's] silence in reliance, albeit misplaced, upon Fifth Amendment rights, makes him no less unavailable than death or absence from the country or physical inability to speak."). *Mobley* was decided before the adoption of the Federal Rules of Evidence.

18. The fact that she testified at the *voir dire* hearing does not, by itself, mean that she waived her Fifth Amendment privilege. The privilege is waived only if the prior testimony revealed incriminating facts. *See, e.g., McCarthy v. Arndstein,* 262 U.S. 355, 359, 43 S.Ct. 562, 563, 67 L.Ed. 1023 (1923) ("[W]here the previous disclosure by an ordinary witness is not an actual admission of guilt or incriminating facts, he is not deprived of the privilege of stopping short in his testimony whenever it may fairly tend to incriminate him."); *United*

States v. James, 609 F.2d 36, 45 (2d Cir. 1979), *cert. denied,* 445 U.S. 905, 100 S.Ct. 1082, 63 L.Ed.2d 321 (1980). Of course, once incriminating facts are voluntarily revealed, "the privilege cannot be invoked to avoid disclosure of the details." *Rogers v. United States,* 340 U.S. 367, 373, 71 S.Ct. 438, 442, 95 L.Ed. 344 (1951).

Edwards' *voir dire* testimony was *exculpatory* to both her and MacCloskey. Arguably, she never waived her Fifth Amendment rights. Since we decide that Edwards' complete testimony should have come in, in one form or another, whether she waived her privilege or not, we choose not to parse her testimony for what parts, if any, constituted a possible waiver.

19. We think that the best procedure to follow after a witness has improperly invoked the Fifth Amendment or any privilege in such a situation, is to issue an order, outside of the jury's presence, directing him to testify and admonishing him that his continued refusal to testify would be punishable by contempt. *See United States v. Zappola,* 646 F.2d 48, 54 (2d Cir. 1981); 4 D. Louisell & C. Mueller, *Federal Evidence* § 486 at 1033 ("[I]t is obvious that the trial judge should in fact advise the witness that his continued refusal will put him in contempt of court and subject him to incarceration or other punishment."). The Advisory Committee notes for Federal Rule of Evidence 804(a)(2) support this approach. "A witness is rendered unavailable if he simply refuses to testify . . . despite judicial pressures to do so." The language of Rule 804(a)(2) is implicitly to that effect.

The government argues that, once it was obvious that Edwards was not properly invoking her Fifth Amendment rights, defense counsel should have specifically requested that she be compelled to testify. Since the trial judge had previously indicated incorrectly that he did not have the authority to determine whether she was properly invoking her rights, such a request would have been futile. *See United States v. Brainard,* Nos. 80–5079/80, 81–6912/13, slip op. at 15 n.10 (4th Cir. 1982) (in circulation). In essence, the district court's errors (first in not inquiring into and ruling on Edwards' claim of privilege, and second in ruling that a witness' invocation of the Fifth Amendment did not make a witness unavailable) rendered Edwards unavailable as a witness for MacCloskey for purposes of Rule 804, even though she may have legally been compelled to

dered to do so and threatened with contempt if she did not, she would be unavailable under Rule 804(a)(2) and her *voir dire* testimony then should have been admitted under Rule 804(b)(1). Of course, if she testified because of the court order, her complete testimony would have been before the jury.

Edwards was the primary defense witness. The testimony she gave in the first *voir dire* was detailed and contradicted, or offered innocent explanations to, Honeycutt's damaging testimony. In short, her *detailed* testimony was vital to MacCloskey's defense. Since the evidence against MacCloskey was not overwhelming and consisted largely of Honeycutt's testimony concerning Edwards' statements and actions, we are unable to say that the error was harmless. *Cf. Williams v. Zahradnick*, 632 F.2d 353, 360 (4th Cir. 1980) ("An error is harmless only when the court, after assessing 'the record as a whole . . .' can conclude beyond a reasonable doubt that the error did not influence the jury's verdict."). Accordingly, we grant a new trial as to the count charging a conspiracy to murder Lansley.

### D. *Improper Prosecutorial Behavior*

■ We also have serious doubts about the propriety of the U. S. Attorney's eleventh hour call to Edwards' attorney suggesting that she would be well-advised to remember the Fifth Amendment. Appellant forcefully argues that the action of the U. S. Attorney violated the defendant's due process right to present his defense witnesses freely. The government's "suggestion"

destroyed the choice of Edwards to testify freely. *See, e.g., United States v. Morrison*, 535 F.2d 223 (3d Cir. 1976);[20] *United States v. Thomas*, 488 F.2d 334 (6th Cir. 1973). The government virtually concedes the error, referring in its brief to the U. S. Attorney's call as "ill-advised and possibly improper," but argues that any error was harmless.

Some courts have suggested that the harmless error rule does not apply to this type of constitutional violation. In *United States v. Hammond*, 598 F.2d 1008, 1013 (5th Cir. 1979), the court stated:

> On the basis of [*Webb v. Texas*, 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972)], both the third and the sixth circuits have stated that they would not require a finding of prejudice in order to reverse a conviction because of this type of due process violation. *United States v. Morrison*, 535 F.2d 223 (3d Cir. 1976); *United States v. Thomas*, 488 F.2d 334 (6th Cir. 1973). We agree with their analysis of *Webb* and hold that this type due process violation is harmful per se.

For the same reasons previously mentioned, we do not think the error was harmless,[21] therefore we find it unnecessary to determine whether the harmless error rule applies to this type of constitutional violation. Therefore, the error independently warrants the grant of a new trial.[22]

Accordingly, we reverse the conviction for conspiracy to murder Special Agent Skaggs due to insufficiency of the evidence. We grant a new trial on the count charging a conspiracy to murder Steve Lansley.

REVERSED AND REMANDED.

testify if no errors had been made. Under the circumstances, her unavailability obviously was not of MacCloskey's doing.

20. Although the actions of the prosecuting attorney were more egregious in *Morrison* than in the case at bar, *Morrison* is instructive. In that case, the government had decided not to prosecute the defendant's girlfriend. On the day of the trial, she assured defense counsel that she would testify. In the next few days, the prosecutor sent out three messages warning her, among other things, that "if she testified, that testimony would be used as evidence against her." 535 F.2d at 225. He also sent her an illegal subpoena and had her brought to

his office to impress upon her the force of the law. At that encounter, he again warned her of the dangers of testifying.

21. The fact that Edwards answered many of the questions asked of her does not necessarily indicate that the error was harmless. *See United States v. Morrison*, 535 F.2d 223, 227 n.9 (3d Cir. 1976) (witness had testified to many relevant matters).

22. In light of our decision, we find it unnecessary to address the other issues MacCloskey alleges as error.