940 F.2d 653
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Thomas M. HAYNIE, Defendant-Appellant.
 No. 91-5000.
 United States Court of Appeals, Fourth Circuit.
 Submitted July 17, 1991.
Decided Aug. 14, 1991.
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk. Rebecca B. Smith, District Judge. (CR-90-56-N)
 Thomas M. Haynie, appellant pro se.
 William D. Braun, United States Department of Justice, Washington, D.C., for appellee.
 E.D.Va.
 AFFIRMED.
 Before WIDENER and MURNAGHAN, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 OPINION
 PER CURIAM:
 
 
 1
 Thomas M. Haynie appeals from the judgment entered by the district court following a jury verdict finding Haynie guilty of interfering with a satellite transmission. We affirm.
 
 
 2
 Haynie was indicted by a federal grand jury on three counts of interfering with the operation of a satellite, 18 U.S.C. Sec. 1367(a), and three counts of transmitting energy without a license, 47 U.S.C. Secs. 301 and 501. These charges arose from the unauthorized transmission on September 6, 1987, of three religious messages which interrupted the regularly scheduled adult programming of several satellite broadcasters. The government contended that Haynie used the satellite ground station facilities of his employer, the Christian Broadcast Network ("CBN"), to generate these messages.
 
 
 3
 The jury convicted Haynie on count three, charging a Sec. 1367 violation, and count six, charging a Sec. 301 violation, both arising from the message that interfered with a broadcast by the Playboy channel. Haynie was subsequently sentenced to three years probation, a $1,000 fine, and 150 hours of community service. Haynie filed a timely notice of appeal. Though Haynie was represented by retained counsel at trial, he is proceeding pro se on appeal.
 
 
 4
 Haynie raises three issues on appeal: he challenges the district court's denial of his timely motions for judgment of acquittal; he contends that impermissible hearsay testimony was introduced at trial; and he challenges the denial of his motion to require the government to elect between charges under Fed.R.Crim.P. 14. We address these issues in turn.
 
 
 5
 The test for deciding a motion for acquittal is whether, giving the government the benefit of all reasonable inferences, there is sufficient evidence from which any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. MacCloskey, 682 F.2d 468, 473 (4th Cir.1982).
 
 
 6
 The government's case was technical and circumstantial; the testimony covered nine days and over 1900 pages of transcript. We summarize briefly only the most salient portions of the government's case to demonstrate the sufficiency of this evidence.
 
 
 7
 George Dillon, chief of the aviation and marine branch of the Federal Communications Commission ("FCC"), testified that on the date of the interference episodes there were approximately 370 earth stations in the United States with an antenna of sufficient size to generate the signal necessary to cause the interference. Of these, he testified that approximately 178 were capable of transmitting video programming. Dillon further testified that by circulating photographs of the interference he was able to determine that the video message had been generated on a Knox Products K-50 character generator. Dillon then testified that of the 178 earth stations which had the potential to create the interference, six also had a Knox K-50 character generator.
 
 
 8
 The designer of the Knox K-50 testified at trial that the characters seen during the interference episodes were produced by a Knox K-50. Dr. Michael Marcus, the assistant bureau chief in the FCC's Field Operations Bureau and the government's expert witness in the area of signal analysis and identification, also testified that all the tests performed by the FCC on tapes of the interference episodes were consistent with production by a Knox K-50 character generator. Marcus testified that as a result of testing by the FCC it was his opinion that the interference episodes were produced by the CBN Knox K-50.
 
 
 9
 Marcus also testified that the start of the interference episodes was marked by a period of "fuzziness" which lasted 1.67 seconds. He further testified that such a phenomenon was the result of the transmitter responsible for the interference operating for a certain period of time at low power and then shifting into a full-power mode. This step-up in power is a characteristic of Varian Gen-2 transmitters. Each transmitter has a particular time at which it steps up that varies somewhat from transmitter to transmitter, but each transmitter itself never varies by more than 1/100 of a second. The CBN ground station used a Varian Gen-2 transmitter and Marcus testified that the FCC tested this transmitter three times with resulting step-up measurements of 1.66, 1.67, and 1.68 seconds.
 
 
 10
 Haynie took the stand in his own defense and testified that he was the only operator on duty in the CBN ground station control room on the night the interference episodes occurred.
 
 
 11
 Haynie misconstrues the government's burden at trial; he contends that the government was required to exclude all other possibilities and to prove that only the CBN facility and its equipment could have been used to generate the interference. His challenges on appeal reflect this misconception. He argues that the evidence was insufficient because the FCC tested only 56 of the 1298 Knox K-50 character generators which had been sold prior to September 6, 1987, and only 17 of the 405 Varian Gen-2 transmitters. Even assuming that locating and testing all of the existing units was practical, the government was simply not required to exclude every hypothesis of innocence. The limited extent of the government's testing may have detracted from the weight of its case, and defense counsel argued this strenuously to the jury, but it did not reduce it below the level where a rational trier of fact could rely upon it to reach a finding of guilt.
 
 
 12
 As to the challenge to Dillon's testimony on hearsay grounds, we agree with the district court's oral rulings that the testimony was not hearsay, and that if it was, it was admissible under Fed.R.Evid. 803(24).
 
 
 13
 Finally, we also agree with the district court's oral rulings denying Haynie's motion under Fed.R.Crim.P. 14. Under Blockburger v. United States, 284 U.S. 299 (1932), a double jeopardy problem would arise unless "each provision requires proof of a fact which the other does not." Blockburger, 284 U.S. at 304. The district court found several factors that were unique to each of the statutes. Most importantly, Sec. 1367 requires interference specifically with a satellite transmission; Sec. 301 does not. Section 301 requires proof that a transmission was in violation of federal law or an FCC license; Sec. 1367 does not. In addition, Sec. 301 requires proof of the operation of an apparatus for the transmission of radio waves; Sec. 1367 does not restrict its reach to interference with satellite transmissions caused only by radio transmission. Finally, Sec. 301 requires proof of an effect extending beyond the borders of the transmitter's state while Sec. 1367 does not.*
 
 
 14
 In conclusion, we affirm the judgment of the district court in its entirety. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the Court and argument would not aid the decisional process.
 
 
 15
 AFFIRMED.
 
 
 
 *
 The district court apparently also denied the motion because it was untimely under the district court's local rules. Because we agree that it was without merit we do not address this issue