******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* ANTHONY
COLLYMORE
(AC 37703)

Gruendel, Lavine and Mullins, Js.*

*Argued January 14—officially released October 11, 2016*

(Appeal from Superior Court, judicial district of
Waterbury, Cremins, J.)

*Susan M. Hankins*, assigned counsel, for the appellant (defendant).

*Robert J. Scheinblum*, senior assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Cynthia S. Serafini*, senior assistant state's attorney, for the appellee (state).

*Opinion*

GRUENDEL, J. It is well established that the state may immunize from prosecution a witness called in its case-in-chief. See generally General Statutes § 54-47a. The primary question in this appeal is whether the state, after immunizing such a witness for testimony given during the state's case-in-chief, may decline to extend that immunity to the same witness in connection with his testimony during the defense case-in-chief. Here, we conclude that the state was not required to grant three prosecution witnesses additional immunity for their testimony during the defense case-in-chief, and that the court's refusal during the defense case-in-chief to compel those witnesses to testify when they invoked their fifth amendment right to remain silent was proper as to some testimony and harmless as to the rest. Accordingly, because we conclude that the remainder of the defendant's claims—three evidentiary claims and a claim that the court improperly penalized the defendant at sentencing for electing to go to trial—also lack merit, we affirm the judgment of conviction.

The defendant, Anthony Collymore, appeals from that judgment, rendered after a jury trial, of (1) felony murder in violation of General Statutes § 53a-54c; (2) attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-134 (a) (2); (3) conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 (a) and 53a-134 (a); and (4) criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1).[1]

At trial, the jury reasonably could have found the following facts. On January 18, 2010, the defendant and two of his friends, Rayshaun Bugg and Vance Wilson (Vance), were driving around Waterbury in a white, four door, rental Hyundai that the defendant's aunt and uncle had lent to him, looking to rob someone. Eventually the three men drove into the Diamond Court apartment complex, which comprises eight apartment buildings. Halfway down the main road of the complex, the men saw an expensive-looking, black Acura sport utility vehicle (SUV) and decided to rob its driver.

They drove down a small road behind the apartments, where the defendant and Vance pulled out their guns and exited the Hyundai, saying that they were going to rob the driver of the SUV. The defendant had a .38 revolver and Vance had a .357 revolver. Bugg drove to the end of the small road and waited. The defendant and Vance reached the SUV, saw two young children running toward its driver, and decided to call off the robbery. The SUV drove away.

The defendant and Vance then saw seventeen year old John Frazier (victim) and decided to rob him. As they were trying to rob him, he slapped away one of their guns and ran toward his apartment, at the entrance

to the complex. The defendant and Vance both fired shots at the victim.

Bugg drove up, the defendant and Vance ran over to the Hyundai and got in, and they sped off to the apartment of Jabari Oliphant, a close friend who lived in Waterbury. There, the defendant and Vance explained to Bugg and Oliphant what had just transpired at Diamond Court, namely, that they had intended to rob the man in the SUV but decided not to when they saw his young children; instead, they tried to rob the victim and shot him when he resisted. They then asked Oliphant if he had something to clean their guns.

Police arrived at Diamond Court within minutes of the shooting and found the fatally wounded victim in front of his family's apartment. An autopsy revealed that a single .38 class bullet through the victim's heart had killed him.[2] The defendant was arrested and tried.

At trial, the state's case included more than thirty witnesses, who testified over the course of fifteen days. A jury found the defendant guilty, and the court imposed a sentence of eighty-three years in prison. The defendant now appeals from that conviction.

I

The defendant's first claim is that the court improperly failed to compel three defense witnesses to testify. Specifically, the defendant argues that the court improperly allowed the state to revoke the immunity of three prosecution witnesses when they were called as defense witnesses, then improperly allowed those witnesses to invoke their fifth amendment right and refuse to testify, and that these two errors combined to unconstitutionally deny the defendant these witnesses' exculpatory testimony.

A

The following additional facts and procedural history are relevant to this claim. At the defendant's trial, the state granted immunity to three witnesses—Bugg, Vance, and Oliphant—in exchange for their testimony during the state's case-in-chief. Although they were called as prosecution witnesses, once they began to testify, these witnesses repudiated prior statements inculpating the defendant and testified so as to exonerate him, reiterating their exculpatory testimony when the defense cross-examined them. The defendant sought to examine those witnesses again during his case-in-chief but, this time, each witness invoked his fifth amendment right and refused to answer many or all questions asked.

The inculpatory evidence from these three witnesses came from recorded statements they gave before trial to various authorities, which the court admitted for substantive purposes.[3] The statements differed markedly from the trial testimony, and each of the three

witnesses repudiated his statements at length during the state's direct examination and the defendant's cross-examination. We discuss each witness in turn.[4]

### 1

Bugg was the first of the three witnesses granted immunity. When the state called him to testify in its case-in-chief, he communicated through his attorney that he would be invoking his fifth amendment right against self-incrimination, fearing that the state might bring drug charges against him for his activities on the night of the shooting and perjury charges if he contradicted the testimony he had given at the defendant's probable cause hearing. The state told the court: "Your Honor, based on our review of the statute, the state intends to give [Bugg] use immunity for any drug activity he was engaged in on January 18, 2010. . . . [In addition] the state does not intend to prosecute [Bugg] for any perjury that he may have committed at the probable cause hearing." The court informed Bugg that as a result, "your [immunity under the statute] doesn't exist, because the state has removed [the possibility of prosecution that] would otherwise allow you to [claim the immunity]." Bugg indicated that he understood. The court instructed the jury that "under [§] 54-47a, [Bugg] has been compelled to testify . . . ."

### a

#### Bugg's Testimony during State's Case-in-Chief

When the state examined Bugg during its case-in-chief, he testified that on January 18, 2010, he, the defendant and Vance drove to Diamond Court to buy drugs from "the weed man," and then drove to Oliphant's apartment. Bugg acknowledged under questioning that this story differed from the police statement he gave on February 10, 2011, and from his testimony at the defendant's probable cause hearing on August 30, 2011. In repudiating his earlier statements, he claimed, however, that the police had forced him to sign the statement after writing it themselves and that he had testified falsely at the probable cause hearing in exchange for a plea deal.

On cross-examination, Bugg reiterated that, on January 18, 2010, there was never any plan to rob someone, they were "going to get some weed, that was the whole thing," and he did not see the defendant or Vance with a gun that night. Bugg testified that he signed the police statement in exchange for a plea deal and because the police beat him, and that his testimony at the probable cause hearing was part of the same plea deal.

### b

#### Bugg's Prior Inconsistent Statements

The state submitted the two statements made by Bugg prior to his testimony at trial, both of which were admitted into evidence for substantive purposes under *State*

v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).

First, the state introduced Bugg's police statement, made on February 10, 2011, through Lieutenant Michael Slavin, one of the detectives who had taken it. Slavin testified that Bugg had agreed with the statement he had given to the police and that the police did not beat or threaten Bugg. The court admitted the statement as a full exhibit.

Bugg stated to the police that on January 18, 2010, he, the defendant and Vance were driving around when the defendant and Vance saw a black Acura SUV at Diamond Court, pulled out their guns, told Bugg that they were going to rob its driver, and got out of the car. Bugg saw the defendant with a .38 revolver and Vance with a .357. Soon, Bugg heard five or six gunshots and saw the defendant and Vance running up. They got into the Hyundai and told Bugg to drive, and he sped away. When they arrived at Oliphant's apartment, Vance and the defendant explained to Bugg that "the guy in the Acura had a baby in it, so they felt bad; instead [they] took the young nigga." The defendant told Bugg that Vance "ha[d] his gun to the [victim's] chest" while they were trying to rob him, "and the [victim] tried to grab it and they started to tussle over the gun, [and] that is why he shot him." While the defendant was talking, Vance asked for some ammonia so that he could clean off his gun.

Second, Bugg's probable cause hearing statement, made on August 30, 2011, was admitted into evidence through the testimony of the court reporter who had recorded and transcribed it. At the probable cause hearing, Bugg had testified that the defendant and Vance decided to rob the man in the Acura SUV, that they went to do so, that he heard gunshots, that the defendant and Vance came running to the Hyundai, that they got in and he drove off, and that at Oliphant's apartment they had stated that they robbed someone else instead.

c

Bugg's Testimony during Defense Case-in-Chief

When the defense told the court that it would be calling Bugg as a witness, the state told the court that "the state's granting of immunity to the—the prosecution witnesses does not extend to them as defense witnesses . . . ." The court told Bugg that there was "an issue as to whether or not the immunity that the state gave [him] when [he was] here before applie[d] to [his] testimony now, because now [he was] being called by the defendant . . . and that issue, whether or not the immunity attache[d] [was] unclear," so "what [he] should do is be guided by what [his] attorney," who would be sitting next to him during his testimony, "advise[d] [him] as to answering any of the questions." When the state added that, "notwithstanding the court's

position, it is the state's that [Bugg] is not being given . . . immunity for his testimony at this point in time," the court clarified, "I want to be sure this is clear for the record. I believe what I said to [Bugg] is that the law is unclear as to whether or not the immunity he was given by the state relates to his testimony as a defense witness."

In response to questions about the night of January 18, 2010, Bugg testified that he was driving the Hyundai that night, that he "thought they was going to get some weed," and that he did not know where the shooting occurred because he "was in a car." Bugg asserted his fifth amendment rights when asked where he drove after the defendant and Vance exited the car, and where he was when he heard gunshots. Bugg also answered defense counsel's questions about various phone calls he had made from prison and asserted his fifth amendment rights for only one such question—after testifying that his cousin, Marquise Foote, had stolen from him, he asserted his fifth amendment rights when asked what was stolen.

As to his testimony at the probable cause hearing, Bugg agreed with the defense counsel that he had testified at that hearing "for the purpose of getting a deal," but asserted his fifth amendment rights when asked if his testimony at that hearing was true.

2

Vance was the second of the three witnesses granted immunity. When the state called him to testify, he waived his fifth amendment right against self-incrimination. The state later clarified that it had granted Vance immunity "for a claim of false statement . . . ."

a

Vance's Testimony during State's Case-in-Chief

During the state's case-in-chief, Vance testified that on January 18, 2010, he and Bugg accompanied the defendant to Diamond Court to collect $3000 from someone so that the defendant could repay Vance for heroin Vance had given the defendant. Vance believed that they were "going to ask [the man] where the money is. That's all." When they arrived, that man drove off, Vance punched the defendant in the jaw and, believing that the defendant was "reaching for something," Vance shot at the defendant with a .357 Taurus Magnum revolver as he ran away. Vance testified that he had never seen the defendant with a gun but had seen him with a knife. Soon, the defendant got back into the car with Vance and Bugg, and they drove off.

The state asked Vance about his two prior accounts of the shooting—his statement to police on February 22, 2011, and his guilty plea on February 21, 2012—both of which differed from his trial testimony. Vance claimed that he signed the police statement only

because he had been threatened with the death penalty and that he entered his guilty plea in exchange for a sentence of only thirty to fifty years' incarceration. When questioned about his police statement and guilty plea, Vance repudiated both and persisted in his story about driving to Diamond Court to collect money owed him for heroin.

On cross-examination, Vance essentially reiterated his testimony given on direct examination.

b

Vance's Prior Inconsistent Statements

The state submitted the two statements made by Vance prior to his testimony at trial, both of which were admitted into evidence for substantive purposes under *State* v. *Whelan*, supra, 200 Conn. 753.

First, the state introduced Vance's police statement, made on February 22, 2011, through Slavin, who testified that Vance had signed at the bottom of each page and that no one threatened or forced him to do so. In Vance's statement, he said that on January 18, 2010, he, the defendant and Bugg drove to Diamond Court where they saw a black Acura SUV and decided to rob its driver. Vance took out a .357 revolver, the defendant took out a .38 revolver, and they exited the car and ran up to the SUV, but they then saw two young children, causing them "to let it go." The SUV drove off. Vance and the defendant then saw the victim walking by and decided to rob him. The defendant stuck his gun in the victim's chest, saying, "you know what it is," but the victim slapped the gun away and took off running. The defendant and Vance each fired two or three shots in the victim's direction before getting into their car and driving to Oliphant's apartment. There, the defendant asked for Vance's gun so he could dispose of it and his gun.

Second, Vance's guilty plea statement was admitted into evidence through the testimony of the court monitor who recorded and transcribed it. At the guilty plea hearing, Vance had admitted that the defendant asked him to commit a robbery; that he, the defendant, and Bugg decided to rob the man in the SUV; that both he and the defendant had guns; that the defendant's gun was a .38; that they decided against robbing the SUV when they saw its driver had young children; that they tried to rob the victim instead; that the defendant ran up to the victim first and put a gun to his chest; that Vance fired two or three shots when the victim ran; that the defendant fired shots as well; and that back at Oliphant's apartment on Walnut Street, Vance gave his gun to the defendant when asked.

c

Vance's Testimony during Defense Case-in-Chief

When the defense called Vance as a witness, the state

asserted that "it is the state's position that any testimony that he gives at this portion of the proceeding is not covered by . . . immunity." The court repeated to Vance the same advisement it had given Bugg concerning immunity and told him to "be guided by the advice of your attorney and that's—that's the way we should proceed."

The court asked for an offer of proof outside the presence of the jury, during which defense counsel asked what the police said when they took Vance's statement, whether Vance shot the victim, and whether Vance called a person named Karen Atkins in June, 2012. Vance replied: "Based on the advice of my counsel, I'm going to invoke my fifth amendment right."

Although the defendant argued that Vance had no valid fifth amendment right to assert, the state and Vance's attorney argued that Vance had yet to be sentenced on a guilty plea to various charges arising from the January 18, 2010 shooting; that the plea deal allowed a sentence in the range of thirty to fifty years; and that until Vance was sentenced his fifth amendment right against self-incrimination continued to apply to the events of January 18, 2010. The court held that Vance's fifth amendment right continued to apply until after sentencing and that, because the state "sa[id] on the record that [Vance] is not being immunized with respect to his testimony as a defense witness," therefore he "properly, in my view, invoked his fifth amendment privilege." Because it would be improper to call a witness for the sole purpose of having him invoke the fifth amendment in front of the jury; see *State* v. *Person*, 215 Conn. 653, 660–61, 577 A.2d 1036 (1990), cert. denied, 498 U.S. 1048, 111 S. Ct. 756, 112 L. Ed. 2d 776 (1991); the court excused Vance without having him testify as a defense witness.

3

Oliphant was the third of the three witnesses granted immunity in connection with the defendant's trial. When the state called him to testify, he communicated through his attorney that he would be invoking his fifth amendment right against self-incrimination. Oliphant's attorney discussed with the court Oliphant's fear that the state might bring false statement charges against him if he contradicted his statement to police, and hindering prosecution charges for his interactions with the defendant, Vance, and Bugg after the shooting. After a colloquy with the prosecutor, the court told Oliphant, "you don't have a fifth amendment privilege because . . . you have been given transactional immunity by the state." Oliphant said that he understood.

a

Oliphant's Testimony during State's Case-in-Chief

During questioning in the state's case-in-chief, Oliphant testified that on the night of January 18, 2010,

he was at the apartment on Walnut Street when the defendant, Vance, and Bugg came over. Privately, Vance told Oliphant that he had just killed someone, and wanted to kill Bugg and the defendant "because he didn't want to leave no witnesses." A couple of days later, Bugg told Oliphant that the defendant, Vance, and he had been driving around drinking and smoking that night, when Vance "saw somebody walking down the street, hopped out [of] the car, [and] tried to rob him. The [victim] fought [Vance] off and [Vance] shot [the victim]. [Vance] jumped back in the car and they sped off." Oliphant further testified that the defendant never talked about the shooting with him, and that Oliphant had never seen the defendant with a gun, but that he had seen Vance with a .357 caliber gun before the January 18, 2010 shooting.

Oliphant acknowledged that this story differed from the statement he had given to the police on February 2, 2011. He claimed, however, that the police made him sign that statement after beating him for hours, while he was high on PCP and alcohol. When the state questioned Oliphant line by line, he again repudiated his statement and persisted in his story that he was told that Vance got out of the car alone and robbed a passerby.

On cross-examination, defense counsel examined Oliphant extensively about his statement, which Oliphant repudiated and said he signed only because police beat him and a prosecutor "was offering [him] deals to perjure [him]self . . . ."

b

Oliphant's Prior Inconsistent Statement

The state submitted Oliphant's police statement into evidence and the court admitted it for substantive purposes under *State* v. *Whelan*, supra, 200 Conn. 753. The state again called Slavin as a witness, who testified that he had taken Oliphant's police statement in the same manner he had taken Bugg's and Vance's statements, and that no one forced or threatened Oliphant to sign.

In the statement, Oliphant said that on the night of January 18, 2010, at the apartment on Walnut Street, Vance and the defendant both told Oliphant that they had been driving around with Bugg looking to rob someone when they saw the victim in the Diamond Court apartment complex. They told Oliphant that they tried to rob the victim, but when he fought back and ran toward his apartment, Vance shot him in the back. At some point, Bugg also spoke with Oliphant and told him that the defendant, Vance, and he were driving around in the white car on January 18, 2010, looking for someone to rob, that they saw the victim in the Diamond Court apartment complex, and that Vance shot the victim as he ran away. Oliphant previously had seen Vance with a .357 caliber gun and the defendant with a .38 caliber revolver.

c

Oliphant's Testimony during Defense Case-in-Chief

When the defense tried to call Oliphant as a witness, the state told the court that "it's the state's position that the immunity that was given to Mr. Oliphant when he testified as a prosecution witness in the state's case-in-chief . . . ended . . . and he has no immunity for anything that goes on today." The court advised Oliphant concerning immunity as it had Bugg and Vance and told him to "be guided . . . by [his] attorney's advice . . . ." Oliphant's attorney said that Oliphant would not answer any questions "[b]ased on the representation that immunity will not be extended to him being called as a defense witness."

During an offer of proof outside the presence of the jury, defense counsel asked several questions about Oliphant's February 2, 2011 statement to the police. Oliphant invoked the fifth amendment when asked if he was beaten on that date and what he had meant by part of his trial testimony as a prosecution witness,[5] but he did testify that, on February 2, 2011, he was arrested with a man named Jamel, whom he had not known for long. The state asked three questions on cross-examination—how, and for how long, had Oliphant known Jamel before their arrest; and did they have narcotics when arrested. Oliphant asserted his fifth amendment rights in response to each question.

The state argued that Oliphant could not selectively assert his fifth amendment rights, testifying about a subject for the defense but refusing to answer the state's questions about the same subject. Defense counsel agreed that if Oliphant did so, then he would be unavailable for cross-examination and so the court would have to strike his testimony. See *State* v. *Marsala*, 44 Conn. App. 84, 92–93, 688 A.2d 336 (court properly struck defendant's entire testimony where he refused to answer questions on cross-examination), cert. denied, 240 Conn. 912, 690 A.2d 400 (1997). The court held that, because Oliphant "indicated he is not going to respond to any of the questions asked on cross-examination by the state," it would be futile to call him as a witness only to have his testimony stricken. Accordingly, the court released Oliphant from the subpoena with which he had been served, and he did not testify as a defense witness.

B

With that factual history in mind, we now turn to the defendant's first claim on appeal, which is that the court improperly (1) allowed the state to revoke the immunity of Bugg, Vance, and Oliphant, three prosecution witnesses, when they were called as defense witnesses; and (2) failed to compel those three witnesses to testify when they asserted their fifth amendment rights as defense witnesses, thus denying the defendant crucial,

exculpatory testimony. We address each argument in turn.

### 1

The defendant argues that the court improperly allowed the state to "revoke" its grant of immunity to Bugg, Vance, and Oliphant when they were called as defense witnesses and, that the revocations violated the defendant's rights to due process and a fair trial under the fourteenth amendment to the United States constitution, as well as his rights to compulsory process and to present a defense under the sixth amendment[6] to the United States constitution.[7] As we have noted, the state initially had granted each witness immunity during the prosecution's case-in-chief, pursuant to § 54-47a.[8] When the defendant called those same witnesses for his case-in-chief, the state told each of them that they no longer had immunity.

The defendant characterizes this as a "revocation" of immunity and argues that such a revocation violated his constitutional rights because it effectively prevented the witnesses from testifying. By contrast, the state argues that it "did not *revoke* grants of immunity to any of its witnesses" and that the real question is whether the court properly held that the state need not grant *additional* immunity to those witnesses. (Emphasis added.) We agree with the state that, because it did not revoke the witnesses' immunity and the court properly held that the state was under no obligation to grant them additional immunity, the defendant's constitutional rights were not violated.

First, to the extent that the defendant claims that the court violated his constitutional rights by misapplying § 54-47a to permit the state to *revoke* immunity previously granted under § 54-47a, we must interpret that statute. "To the extent that the [defendant's] claim requires us to interpret the requirements of [a statute], our review is plenary." *In re Nevaeh W.*, 317 Conn. 723, 729, 120 A.3d 1177 (2015). We begin with the statute's text and relationship to other statutes, and consider other evidence of its meaning only if the text itself is either ambiguous or yields absurd results. Id., 729–30.

Section 54-47a has two parts. Section 54-47a (a) provides in relevant part: "Whenever in the judgment of . . . a state's attorney . . . the testimony of any witness . . . in any criminal proceeding involving . . . felonious crimes of violence . . . or any other class A, B or C felony . . . [is necessary to obtain] sufficient information as to whether a crime has been committed or the identity of the person or persons who may have committed a crime . . . [and] is necessary to the public interest . . . the state's attorney . . . may, with notice to the witness, after the witness has claimed his privilege against self-incrimination, make application to the court for an order directing the witness to tes-

tify . . . ."

Section 54-47a (b) provides in relevant part: "Upon the issuance of the order such witness shall not be excused from testifying . . . on the ground that the testimony . . . may tend to incriminate him or subject him to a penalty or forfeiture. No such witness may be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he is compelled to testify . . . and no testimony . . . so compelled, and no evidence discovered as a result of or otherwise derived from testimony . . . so compelled, may be used as evidence against him in any proceeding, except that no witness shall be immune from prosecution for perjury or contempt committed while giving such testimony . . . ."[9]

The plain language of § 54-47a (b) thus provides that, if a witness is compelled to testify about a "transaction, matter or thing," then the witness cannot be "prosecuted or subjected to any penalty or forfeiture for or on account of" that transaction, matter, or thing. Nothing in the statute suggests that a prosecutor may later revoke that immunity, before or after the witness testifies, and decide to prosecute the witness after all. Indeed, if the state had such power, then the immunity promised under § 54-47a would be an empty gesture. We conclude that, in the absence of special circumstances, once the state grants a witness immunity under § 54-47a, it plainly lacks the power to revoke that immunity. Accordingly, to the extent that Bugg, Vance, or Oliphant was compelled under § 54-47a to testify about a transaction, matter, or thing during the state's case-in-chief, then, from that point on, the state could no longer prosecute them for or on account of it.[10]

The state argues, and we agree, that it "did not *revoke* grants of immunity to any of its witnesses." (Emphasis added.) Given the constraints imposed by § 54-47a, the state's comments to the three witnesses are best understood not as a "revocation" of the immunity that they already had, but rather as a refusal to grant those witnesses *additional* immunity.[11] To wit, the state did not wish to grant them both transactional immunity from prosecution for any transactions discussed for the first time during the defense case-in-chief, and use or derivative use immunity that would bar the state from using their defense testimony—or evidence derived from it— in any potential prosecutions against them that the state could still legally pursue.

The question is not one of revocation. Rather, the question is whether any of the constitutional provisions cited by the defendant required the state to grant that additional immunity to those witnesses.

We therefore turn to whether the state was required to grant the three witnesses additional immunity for their testimony as defense witnesses. "As a threshold

matter, we must first determine the applicable standard of review that governs our examination of the defendant's claims. The issue of whether a defendant's rights to due process and compulsory process require that a defense witness be granted immunity is a question of law and, thus, is subject to de novo review. . . .

"[A] defendant has a right under the compulsory process and due process clauses to present [his] version of the facts as well as the prosecution's to the jury so [that] it may decide where the truth lies. . . . The compulsory process clause of the sixth amendment generally affords an accused the right to call witnesses whose testimony is material and favorable to his defense . . . .

"We begin our analysis with the statutory provision concerning prosecutorial immunity for witnesses. [Section] 54-47a authorizes the prosecution to grant immunity to state witnesses under certain circumstances. We explicitly have held that § 54-47a confers no such authority upon the courts with regard to defense witnesses. . . . Indeed, this court has held repeatedly that there is no authority, statutory or otherwise, enabling a trial court to grant immunity to defense witnesses. . . . We have no occasion to revisit those holdings today.

"We recognize that other courts have held that under certain compelling circumstances the rights to due process and compulsory process under the federal constitution require the granting of immunity to a defense witness. The federal Circuit Courts of Appeals have developed two theories pursuant to which the due process and compulsory process clauses entitle defense witnesses to a grant of immunity. They are the effective defense theory, and the prosecutorial misconduct theory. . . .

"Under the effective defense theory . . . the trial court has the authority to grant immunity to a defense witness when it is found that a potential defense witness can offer testimony which is clearly exculpatory and *essential to the defense case* and when the government has no strong interest in withholding . . . immunity . . . . The Third Circuit [Court of Appeals] has held explicitly that under the effective defense theory [i]mmunity will be denied if the proffered testimony is found to be ambiguous [or] not clearly exculpatory . . . .

"The prosecutorial misconduct theory of immunity is based on the notion that the due process clause [constrains] the prosecutor to a certain extent in [its] decision to grant or not to grant immunity. . . . Under this theory, however, the constraint imposed by the due process clause is operative only when the prosecution engages in certain types of misconduct, which include forcing the witness to invoke the fifth amendment or

engaging in discriminatory grants of immunity to gain a tactical advantage, and the testimony must be material, exculpatory and *not cumulative*, and the defendant must have *no other source to get the evidence*." (Citation omitted; emphasis added; internal quotation marks omitted.) *State* v. *Kirby*, 280 Conn. 361, 403–404, 908 A.2d 506 (2006).

Our Supreme Court previously has declined to decide whether either of these theories is correct, in the absence of circumstances that would then warrant reversal of a judgment on that basis. Id., 405. The present case again provides no occasion to reach the correctness of either theory.

To succeed under the effective defense theory, a defendant must show that the testimony at issue was " 'essential' " to the defense. Id., 404; see, e.g., *United States* v. *MacCloskey*, 682 F.2d 468, 475, 479 (4th Cir. 1982) (reversing judgment of conviction where "primary defense witness" refused to answer some questions before jury as to certain directly relevant details of alleged conspiracy, although "testimony she gave in . . . voir dire was detailed and contradicted, or offered innocent explanations to, [the] damaging testimony" of state's primary witness). Here, by contrast, there is no reason to believe that the three witnesses' testimony during the defense case-in-chief would have been anything other than a rehash of their prosecution testimony, which, if believed, already tended to exonerate the defendant from each of the crimes charged. Each testified at length, favorably to the defendant, both when the state examined them during its case-in-chief and when the defendant cross-examined them. Although it is possible that the witnesses would have provided additional exculpatory details when called as defense witnesses, nothing in the record indicates what those details would have been.[12] See *United States* v. *Triumph Capital Group, Inc.*, 237 Fed. Appx. 625, 630 (2d Cir. 2007) ("[N]o one knows what [the witnesses] would have testified to since they refused to comment on the matter. [The defendant's] speculation that [they] would have testified in [his] favor is not sufficient to prove that their testimony would have been exculpatory."). The defendant has failed to show that any additional testimony the three witnesses may have provided as defense witnesses was essential to his defense.

Likewise, under the prosecutorial misconduct theory, a defendant must show that the testimony at issue was "not cumulative" and that he had "no other source to get the evidence." *State* v. *Kirby*, supra, 280 Conn. 404. The defendant has provided no indication of what new exculpatory testimony he would have elicited from these three witnesses during his case-in-chief. At oral argument before this court, the defendant's counsel was specifically asked what additional details the defendant was prevented from eliciting from these three wit-

nesses, and she provided none. Accordingly, the defendant has failed to show that the witnesses' excluded testimony would not have been cumulative and that he had no other source to get the evidence.

We thus conclude that the state was not constitutionally required to grant additional immunity to Bugg, Vance, and Oliphant when they testified as defense witnesses.

2

The defendant also argues that the court improperly failed to compel Bugg, Vance, and Oliphant to testify when they asserted their fifth amendment rights as defense witnesses, because at that point, as a result of the immunity that the state had granted them during its case-in-chief, they were no longer exposed to prosecution and thus had no valid fifth amendment right to assert.[13] We conclude that the court properly refused to compel these witnesses to answer some questions, that the court improperly refused to compel them to answer other questions, and that any error was harmless because all of the testimony improperly excluded was cumulative.

We begin with our standard of review. "A ruling on the validity of a witness' fifth amendment privilege is an evidentiary determination that this court will review under the abuse of discretion standard. . . . It is well settled that the trial court's evidentiary rulings are entitled to great deference. . . . The trial court is given broad latitude in ruling on the admissibility of evidence, and we will not disturb such a ruling unless it is shown that the ruling amounted to an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Luther*, 152 Conn. App. 682, 699, 99 A.3d 1242, cert. denied, 314 Conn. 940, 108 A.3d 1123 (2014).

"[W]hen an improper evidentiary ruling is not constitutional in nature, the defendant [also] bears the burden of demonstrating that the error was harmful. . . . [W]hether [the improper exclusion of a witness' testimony] is harmless in a particular case depends upon a number of factors, such as . . . whether the testimony was cumulative . . . [and] the extent of cross-examination otherwise permitted . . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Payne*, 303 Conn. 538, 558–59, 34 A.3d 370 (2012).

"The standard for determining whether to permit invocation of the privilege against self-incrimination is well established. To reject the invocation it must be *perfectly clear*, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have [a] tendency to incriminate the witness. . . . The right to the

privilege does not depend upon the likelihood of prosecution but upon the possibility of prosecution." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Giraud*, 258 Conn. 631, 640, 783 A.2d 1019 (2001).

Here, all but three of the questions as to which Bugg, Vance, and Oliphant asserted their fifth amendment rights during the defendant's case-in-chief were questions that they had already answered during the state's case-in-chief. The three new questions were: (1) to Bugg, what his cousin stole from him; (2) to Vance, whether he called a person named Karen Atkins in June, 2012; and (3) to Oliphant, what he meant when he testified during the state's case-in-chief that he felt guilty about Vance.

As to the three new questions, we are unable to conclude that the court abused its discretion in sustaining the witnesses' invocation of their fifth amendment rights. We note that "[i]n appraising a fifth amendment claim by a witness, a judge must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence." (Internal quotation marks omitted.) *Martin* v. *Flanagan*, 259 Conn. 487, 495–96, 789 A.2d 979 (2002). "To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." (Internal quotation marks omitted.) Id., 495. As to the first question, the nature of what Bugg's cousin stole from him could have incriminated Bugg if the item was contraband. As to the second and third questions, the record sheds little light on their significance. Accordingly, on this record, we cannot second-guess the determination of the trial court. We conclude that the court did not abuse its discretion in sustaining the witnesses' invocation of their fifth amendment rights when they were asked about these three transactions, as to which they lacked immunity.[14]

By contrast, as to those questions that the witnesses had already answered during the state's case-in-chief, § 54-47a foreclosed any possibility of prosecution for the transactions, matters, and things at issue. Accordingly, further questions about those same issues did not implicate the witnesses' fifth amendment right against self-incrimination.[15] The court abused its discretion in sustaining the witnesses' invocations of their fifth amendment rights as to those issues.[16]

We conclude, however, that this error was harmless.[17] Here, each witness already had testified and been cross-examined at length, on the same issues, during the state's case-in-chief. We thus conclude that the defendant has failed to meet his burden of proving that the improper exclusion of these witnesses' testimony to

the same effect during his case-in-chief was harmful.

Because the court did not permit the state to revoke these witnesses' immunity and properly held that the state need not grant them additional immunity when they were called as defense witnesses, and because the court's failure to compel these three witnesses to reiterate testimony as defense witnesses was harmless, the defendant's first claim fails.

## II

The defendant's second group of claims entails three alleged evidentiary errors: (1) that the court improperly admitted uncharged misconduct evidence suggesting that the defendant had a gun one week before the shooting and four months after the shooting; (2) that the court improperly admitted a prior inconsistent statement by Bugg to impeach his trial testimony that he had never discussed the shooting with his cousin; and (3) that the court improperly permitted the state's lead detective, Slavin, to testify, in the course of describing how the investigation proceeded, about various witnesses' statements to the police.

We begin by setting forth the standard of review. "We review the trial court's decision to admit evidence, if premised on a correct view of the law . . . for an abuse of discretion." *State* v. *Saucier*, 283 Conn. 207, 218, 926 A.2d 633 (2007); see also *State* v. *Douglas F.*, 145 Conn. App. 238, 246, 73 A.3d 915 (because "[t]he trial court has broad discretion in ruling on the admissibility . . . of evidence . . . [t]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion" [internal quotation marks omitted]), cert. denied, 310 Conn. 955, 81 A.3d 1181 (2013). "In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the trial court's rulings on evidentiary matters." (Internal quotation marks omitted.) *State* v. *Gauthier*, 140 Conn. App. 69, 79–80, 57 A.3d 849, cert. denied, 308 Conn. 907, 61 A.3d 1097 (2013).

"[W]hen an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [W]hether [the improper admission of a witness' testimony] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the [improperly admitted] evidence on the trier of fact and the result of the trial. . . . [T]he proper standard for

determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Payne*, supra, 303 Conn. 558–59.

We address each of the defendant's three evidentiary claims in turn.

A

The defendant first challenges the court's admission of testimony from two witnesses about whether he possessed a gun on two occasions other than the night of the shooting, arguing that such evidence of uncharged misconduct was more prejudicial than probative. Even if the court improperly admitted this testimony, which we do not conclude, nevertheless, it was harmless.

In this regard, the defendant first challenges the court's admission of a portion of Oliphant's testimony during which the prosecutor asked if Oliphant had told the police about an incident on January 9, 2010, when the defendant allegedly shot someone in the groin at a bar fight. Initially, the state sought to admit this testimony for substantive purposes, to prove that the defendant possessed a gun nine days before the Diamond Court robbery and thus had the means to commit the Diamond Court robbery. The defense objected that it was more prejudicial than probative. The court ruled that the state could ask Oliphant only whether the defendant had a gun on January 9 because gun possession then was relevant to "an element of the fifth count of the information,"[18] and "[t]hat is an exception where [the evidence is relevant to] an element of the crime, [and that] is one of the reasons why uncharged misconduct can be allowed." See Conn. Code Evid. (2009) § 4-5 (b) ("[e]vidence of other crimes, wrongs or acts of a person is admissible . . . to prove . . . an element of the crime").

The state, however, sought to ask about the details of the January 9, 2010 incident as well, to the extent that Oliphant had described them in his statement to the police but repudiated that statement at trial. The prosecutor made an offer of proof outside the presence of the jury, during which she examined Oliphant line by line on his police statement about the January 9 incident. Oliphant categorically denied that he ever gave such a statement and added that he had "never seen [the defendant] with a gun." After the proffer, the defense renewed its objection to the testimony. The court ruled that it would allow the questions "only for purposes of [the] impeachment and credibility of Mr. Oliphant," and, when the jury returned to the courtroom, the court instructed it accordingly. The state then examined Oliphant line by line on the statement he had given to

police about the defendant shooting another person in the groin one week before the Diamond Court shooting. Oliphant categorically denied giving such a statement to the police and added that he had "never seen [the defendant] with a gun ever."

The second piece of uncharged misconduct evidence that the defendant claims the court improperly admitted is the portion of his uncle Omar's testimony in which Omar said that he saw the defendant with a gun on May 8, 2010. Initially, the state sought to admit the testimony to prove that the defendant possessed a gun four months after the Diamond Court shooting; the defense objected that such testimony was more prejudicial than probative; and the court ruled that the testimony was admissible under § 4-5 (b) of the (2009) Connecticut Code of Evidence as relevant to an element of the fifth count of the information.[19] After an extensive offer of proof by the state, the defense also objected that the testimony was not relevant to the gun possession charge in count five because the May 8, 2010 gun was not the gun that the defendant allegedly possessed on January 18, 2010. The state argued that the defendant's possession of a different gun four months later was still relevant to whether the defendant possessed a gun on the night of the Diamond Court shooting. The court ruled that Omar's testimony that the defendant possessed a different gun four months after the Diamond Court shooting was not relevant to establish an element of the fifth count of the information but was admissible together with the testimony about gun possession on January 9, 2010, and January 18, 2010, as evidence of "a system of criminal activity" of gun possession engaged in by the defendant, offered to prove the defendant's intent to rob the victim at Diamond Court.[20] See Conn. Code Evid. (2009) § 4-5 (b) ("[e]vidence of other crimes, wrongs or acts of a person is admissible . . . to prove . . . a system of criminal activity"). Omar then testified that he saw the defendant with a handgun on May 8, 2010. In its jury charge, the court instructed the jury that the testimony about gun possession on May 8, 2010, was admitted "solely to show or establish a system of criminal activity being engaged in by the defendant."

Even if the court had improperly admitted both of these portions of testimony, which we do not conclude, we hold that the defendant has nevertheless failed to carry his burden of proving that the jury's verdict was substantially swayed by its admission. See, e.g., *State* v. *Sanseverino*, 287 Conn. 608, 637, 949 A.2d 1156 (2008) ("[e]ven if we were to assume, without deciding, that the trial court improperly admitted the evidence . . . we conclude that the defendant failed to meet his burden of providing that such impropriety was harmful"), overruled in part on other grounds by *State* v. *DeJesus*, 288 Conn. 418, 437, 953 A.2d 45 (2008), and superseded in part after reconsideration by *State* v. *Sanseverino*,

291 Conn. 574, 579, 969 A.2d 710 (2009), overruled in part on other grounds by *State* v. *Payne*, 303 Conn. 538, 548, 34 A.3d 370 (2012).

The defendant acknowledges that his claim is evidentiary, not constitutional, in nature. "[W]hen an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [W]hether [the improper admission of a witness' testimony] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the [improperly admitted] evidence on the trier of fact and the result of the trial. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Payne*, supra, 303 Conn. 558–59.

First, this testimony was not particularly important to the prosecution's case. Whether the defendant had a gun on January 9, 2010,[21] or on May 8, 2010, was ancillary to the central issue of the case, namely, whether the defendant participated in the robbery and shooting of the victim on January 18, 2010. The state presented ample evidence of the robbery, as discussed subsequently in connection with the strength of the prosecution's case.

Second, evidence that the defendant possessed a gun weeks before or months after the shooting was largely superfluous because there was also evidence that he possessed a gun on the night of the shooting.

Third, as to corroborating or contradictory evidence, multiple witnesses either testified or admitted in statements to the police, which the state previously had submitted into evidence, that they saw the defendant with a gun on the night of the shooting or on other nights, while several witnesses—most notably Bugg and Vance, in direct contradiction to their police statements—testified that they had never seen the defendant with a gun. Neither Oliphant's nor Omar's testimony was unique or pivotal in this regard.

Fourth, the defendant was able adequately to cross-examine both Oliphant and Omar. Oliphant testified favorably to the defense during both direct and cross-examination.

Fifth and finally, the prosecution's case was strong. The state's case comprised more than thirty witnesses and more than 200 exhibits over the course of fifteen days of testimony.

The victim's mother testified that, from the family apartment, she saw two people with physiques similar to the defendant and Vance both shoot at the victim at approximately 9:40 p.m. on January 18, 2010. The victim's brother testified that, from the family apartment, he saw the defendant and a second man both shoot at the victim a little after 9:30 p.m. on January 18, 2010.

The state submitted the prior statements and testimony of the defendant's two accomplices, Bugg and Vance, both of whom initially confessed to the armed robbery in those statements and testimony. Although they recanted their confessions once they received plea deals and testified favorably to the defense at trial, the state impeached them with phone call recordings in which Bugg seemingly asked various relatives to help him coordinate his testimony with Vance, saying at one point that Vance had agreed to "take the whole charge" in exchange for some money.

Oliphant and his then girlfriend, Sade Stevens, both gave statements to police that they had heard the defendant and Vance confess to robbing and shooting the victim when they came to Oliphant's apartment on the night of January 18, 2010, although they, too, partially recanted those statements at trial and claimed instead that Vance alone confessed that he robbed and shot the victim.

The state's crime scene technicians and its ballistics expert determined that the four bullet cores recovered from the crime scene plus the intact bullet recovered from the victim's body were .38 class bullets, fired from a .38 Special revolver, a .357 Magnum revolver, or a nine millimeter pistol. Because pistols eject bullet casings when fired, however, the state's ballistics expert testified that the lack of casings found at the crime scene was consistent with the shots being fired from a revolver. Multiple witnesses either testified or gave statements to police that were admitted into evidence to the effect that the defendant had a .38 revolver and that Vance had a .357 revolver, which they had with them on the night of the shooting.

Phone records showed that, at approximately the time of the shooting, the defendant's cell phone reflected several calls from the area of Diamond Court. Various neighbors saw a four door white car driving through Diamond Court just before the shooting and speeding out of Diamond Court just after the shooting. The defendant's aunt testified that, on the night of the shooting, she had lent the defendant her rental car—a four door, white Hyundai—and that they returned the car to the rental company the next day.

The defendant himself testified that, on the night of the shooting, he and Vance dressed all in black and drove to Diamond Court with Bugg in the defendant's white rental car; that they parked behind the apartments; that the defendant and Vance exited the car and walked first toward the man in the SUV, then toward the victim after they realized the man in the SUV had children; that Vance fired shots in the victim's direction; that Bugg pulled up in the car; that the defendant and Vance got in; and that Bugg drove off. The defendant claimed, however, that they never agreed or tried to rob anyone; Vance had gotten into an unrelated altercation with the victim, on his own, and shot him for that reason. The state introduced into evidence phone call recordings in which the defendant repeatedly told his mother to convince one of the prosecution witnesses to invoke her fifth amendment rights if called to testify.

As a result, we conclude that the defendant has failed to carry his burden of proving that the jury's verdict was substantially swayed by the admission of evidence that he had a gun one week before or several months after the shooting.

B

As to Bugg's prior inconsistent statement, the defendant challenges the court's admission of the testimony of Bugg's cousin, Foote, about Bugg's confession to him during a car ride several weeks after the shooting. We conclude that the court properly admitted that testimony for the limited purpose of impeaching Bugg's credibility.

The following additional facts and procedural history are relevant to this claim. Initially, the state sought to admit the challenged testimony for substantive purposes, arguing that, although it was hearsay, it fell under the coconspirator exception to the prohibition on hearsay,[22] but the state later conceded that the coconspirator exception did not apply. Instead, the state sought to admit the testimony solely for impeachment purposes, as extrinsic evidence of a prior inconsistent statement by Bugg. The state argued that, under the Connecticut Code of Evidence, "it's within the judicial discretion of the trial court whether to admit the impeaching statements where no foundation has been laid." See Conn. Code Evid. § 6-10 (c) ("[i]f a prior inconsistent statement made by a witness is not . . . disclosed to the witness at the time the witness testifies, and if the witness admits to making the statement, extrinsic evidence of the statement is inadmissible, *except in the discretion of the court*" [emphasis added]). The defense objected to the testimony as hearsay and argued that, if the state wished to use it as an inconsistent statement, then it should have disclosed it to Bugg when he testified.

After reviewing the transcript of Bugg's earlier trial

testimony, the court noted that Bugg twice had denied confessing to Foote, once when asked directly if "there came a point in time where [he] told [Foote] what had happened on Diamond Court"—Bugg replied, "[n]o"—and, second, when Bugg was asked if his statement to police that "[t]he only one [he] told about this [was his] cousin Marquis[e] Foote" was true—Bugg replied, "[n]o." The court ruled that Foote could testify to Bugg's prior inconsistent statement, but that such testimony would be admissible only for the limited purpose of impeaching Bugg.

Accordingly, before Foote testified to his conversation with Bugg, the court instructed the jury as follows: "Ladies and gentlemen, I talked to you when we first began the trial about evidence admitted for a limited purpose. Any comments that Mr. Bugg made to Mr. Foote, they can be used by you only for purposes of evaluating the credibility of Mr. Bugg; you can't use them for any other purpose. So, to the extent that you find them [relevant] you can use them, but only insofar as they relate to the credibility of Mr. Bugg; they are not to be used by you . . . these statements are not to be used by you for substantive purposes. So, this is a limit[ed] inquiry, credibility only, not for substantive purposes."

Foote testified that three or four weeks after the shooting, he and Bugg were driving around smoking pot when Bugg confided in him what had happened on the night of the shooting. Foote recalled that Bugg had said that he, Vance, and the defendant were out looking to rob someone that night. They saw the victim and decided to rob him. The defendant and Vance got out of the car and put a gun in the victim's face, which he pushed away. The victim then ran away and the defendant and Vance shot him. The state asked if Bugg had ever told Foote that, on the night of the shooting, he, the defendant, and Vance were there to buy marijuana, or to settle a debt. Foote testified that Bugg had not told him such a story.

At the end of the trial, the court again instructed the jury: "The testimony of Marquise Foote was admitted only for impeachment purposes as to Rayshaun Bugg. Any other use of that testimony would be improper."

We begin by setting forth the applicable law. Section 6-10 (a) of the Connecticut Code of Evidence provides: "The credibility of a witness may be impeached by evidence of a prior inconsistent statement made by the witness." Our Supreme Court has held that "[i]mpeachment of a witness by the use of a prior inconsistent statement is proper only if the two statements are in fact inconsistent. . . . Moreover, the inconsistency must be substantial and relate to a material matter." (Citations omitted; emphasis omitted.) *State* v. *Richardson*, 214 Conn. 752, 763, 574 A.2d 182 (1990).

Section 6-10 (c) of the Connecticut Code of Evidence provides in relevant part that "[i]f a prior inconsistent statement made by a witness is not . . . disclosed to the witness at the time the witness testifies, *extrinsic evidence* of the statement is inadmissible, *except in the discretion of the court.*" (Emphasis added.) This court has held that "[w]e have no inflexible rule regarding the necessity of calling the attention of a witness on cross-examination to his alleged prior inconsistent statements before either questioning him on the subject or introducing extrinsic evidence tending to impeach him." (Internal quotation marks omitted.) *State* v. *Gauthier*, supra, 140 Conn. App. 79. Rather, trial "[c]ourts have wide discretion whether to admit prior inconsistent statements that have not satisfied the typical foundational requirements in § 6-10 (c) of the Connecticut Code of Evidence . . . ." (Internal quotation marks omitted.) Id., 80.

Here, the defendant argues that the court abused its discretion in admitting Foote's testimony under § 6-10 (c) of the Connecticut Code of Evidence, as extrinsic evidence of a prior inconsistent statement by Bugg. In view of all the circumstances, we conclude that the court reasonably decided (1) that Bugg's confession to Foote was substantially inconsistent with both his denial of having made such a confession and with his testimony at trial about driving to Diamond Court only to buy marijuana from the "weed man" on the night of the shooting; and (2) that the issue of whether the jury should believe Bugg's statement to police that the defendant and Vance committed the crimes charged, or Bugg's testimony at trial that they merely attempted to buy marijuana, was material to the defendant's guilt or innocence. Accordingly, the court did not abuse its discretion in admitting the challenged testimony for the limited purpose of impeaching Bugg.[23]

C

The defendant dresses his third and final evidentiary claim in constitutional garb, arguing that "the trial court erred in permitting lead detective . . . Slavin to testify about and comment on hearsay information police received from the state's witnesses, [that the admission of this testimony] violated the defendant's rights to confrontation and cross-examination, [that the admission of this testimony] invaded the province of the jury as to both witness credibility and critical disputed facts, and [that the admission of this testimony] was contrary to the rules of evidence." (Internal quotation marks omitted.) The defendant argues that the court permitted Slavin to testify as a "super-witness" who filtered the testimony of other witnesses for the jury. We conclude that the court properly admitted Slavin's testimony for the limited purpose of explaining how the police investigation proceeded.

The following additional facts and procedural history are relevant to this claim. Near the end of the state's case-in-chief, the state recalled Slavin as a witness so that he could testify about how the police investigation of the January 18, 2010 shooting proceeded. As part of this testimony, the state planned to ask Slavin about the statements that various witnesses had given to police. The defense objected that such testimony would be both improper hearsay and improper commentary on the testimony of other witnesses. The court ruled that such testimony was admissible, but only "with respect to individuals that have already testified," and "only for the purpose of [showing] how that affected the [police] investigation . . . [not] for any other purpose." The court added that it would be giving the jury a limiting instruction and, accordingly, instructed the jury as follows:

"You're also going to hear testimony about what some of the witnesses said to the police—witnesses that have already testified here in front of you. That—those comments by Lieutenant Slavin about what a witness said, *that is not intended in any way to affect your individual determination of the credibility of that witness as they—as they sat here on the [witness] stand and testified. The whole purpose of this testimony by Lieutenant Slavin is to give you, in context, how the police investigation proceeded.* So, there are going to be some comments about other things you've heard here from other witnesses. *That's not to be used for any purpose other than how the police reacted to those responses.* So, you've got—we talked about compartments. You've got a compartment for the witness and what the witness testified to. Then you've got a compartment, comments that Lieutenant Slavin may make about what those witnesses said. *Again, only to give you the context of the police investigation.*

"You've got to separate that so the fact that I'm going to allow him to make comments on what somebody else said *doesn't mean in any way, shape, or form that you should treat that testimony any differently than I instructed you to treat all the testimony, which is to take everybody individually and treat them by the same standard.*" (Emphasis added.) The court clarified, "[and] if I said, what they said, I didn't mean in any [way] to support anything that anybody said. I'm just trying to apply the rules as best I can. You've got to determine the credibility. That's your job, not my job."

Slavin testified as follows about the investigation and the role that various witnesses' police statements played in it. Ten days after the shooting, the police received a tip. On the basis of that tip, he entered two nicknames into a police database and came up with the names of the defendant and Oliphant. He searched the Judicial Branch website for those names and found that the defendant received a ticket a few days before the

shooting. From the police report of that incident, he obtained the defendant's phone number and a description of the car he drove, which matched the car seen on the night of the shooting. He also learned of a third individual, Vance, who was with the defendant when he was ticketed.

One year later, on January 5, 2011, Foote was arrested on unrelated charges and told police that he had information about the January 18, 2010 shooting. Foote confirmed that the defendant, Oliphant, and Vance were involved and added a fourth name—Bugg. Foote told police that those individuals tried to rob the victim on the night of the shooting, that the victim "disrespected" the attempted robbery, that they shot him for that reason, and that Bugg was the getaway driver. Foote did not give the police a written statement at that time.

The police next interviewed Oliphant and his then girlfriend, Stevens, who both gave written statements on February 2, 2011, denying that Oliphant was involved and asserting that the defendant, Vance, and Bugg were the culprits. On February 10, 2011, the police interviewed Bugg, who gave a written statement confessing that he, the defendant, and Vance, but not Oliphant, attempted the robbery on the night of January 18, 2010. Bugg's statement that the defendant and Vance initially planned to rob a man in an Acura SUV, but changed plans when they saw he had two children caused one of the detectives to remember a phone call he received shortly after the shooting from a friend who was at Diamond Court picking up his children on the night of the shooting. On February 16, 2011, police interviewed him and took a written statement. On February 18, 2011, the police interviewed Vance's then girlfriend, Vondella Riddick, who gave a written statement. Finally, police traveled to North Carolina where they interviewed Vance, who gave a written statement on February 22, 2011, confessing that he, the defendant, and Bugg attempted to rob the victim and ended up shooting him.

At that point, the police arrested the defendant, Vance, and Bugg. Prior to trial, the police conducted additional interviews, including a second interview with Stevens and an interview with the defendant's aunt, both of whom gave written statements.

After the state finished questioning Slavin, the defense cross-examined him. The defense previously had cross-examined each of the witnesses whose police statements Slavin discussed in his testimony.

The court's final charge to the jury at the end of the trial reiterated that the jurors were "the sole judges of the facts," and that they "must determine the credibility of police personnel in the same way and by the same standards as [they] would evaluate the testimony of any other witness." The charge did not specifically reference Slavin's testimony, but instructed the jury gener-

ally that, "[y]ou will recall that I have ruled that some testimony and evidence has been allowed for a limited purpose. Any testimony or evidence which I identified as being limited to a purpose you will consider only as it relates to the limits for which it was allowed, and you shall not consider such testimony or evidence in finding any other facts as to any other issue."

Although the defendant frames his objection to this testimony in constitutional terms, invoking the sixth amendment's confrontation clause[24] and the fair trial component of the fourteenth amendment's due process clause,[25] his claim is in reality evidentiary in nature. See *State* v. *Smith*, 110 Conn. App. 70, 86, 954 A.2d 202 ("[r]obing garden variety claims [of an evidentiary nature] in the majestic garb of constitutional claims does not make such claims constitutional in nature" [internal quotation marks omitted]), cert. denied, 289 Conn. 954, 961 A.2d 422 (2008).

As to the defendant's confrontation clause claim, the United States Supreme Court has stated that "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." *Crawford* v. *Washington*, 541 U.S. 36, 60 n.9, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). Here, the court "allow[ed] comments [only] with respect to individuals that ha[d] already testified" at trial, on statements that "ha[d] already been presented to the jury . . . ." The defendant had an opportunity to cross-examine those witnesses about their statements and so the confrontation clause was not implicated.[26]

As to the defendant's fair trial claim, because we conclude that the court properly admitted the challenged testimony and properly instructed the jury as to its use, the defendant's right to a fair trial was not implicated.

Proceeding then to the defendant's evidentiary claims, the defendant objects to the testimony on two grounds: (1) as improper commentary on the testimony of other witnesses, and (2) as improper hearsay. Neither objection has merit.

First, the defendant argues that "Slavin's testimony in this case . . . placed an improper gloss on the testimony of other witnesses." (Internal quotation marks omitted.) Our Supreme Court has held that "it is improper to ask a witness to comment on another witness' veracity." *State* v. *Singh*, 259 Conn. 693, 706, 793 A.2d 226 (2002). "[I]t is never permissible . . . to ask a witness to characterize the testimony or statement of another witness . . . ." (Internal quotation marks omitted.) Id., 707; see also id., 708 ("improper to ask question designed to cause one witness to characterize another's testimony as lying"); id. ("question to defendant of whether victim lied in testimony improper

because it sought information beyond defendant's competence").

Here, however, Slavin did not comment on the testimony of other witnesses. Although Slavin did testify about the same underlying facts as other witnesses, such as the statements that various witnesses gave to the police, the defendant has cited to no rule that bars two witnesses from testifying about the same underlying facts. Nor are we aware of any.

Moreover, the defendant's argument that Slavin improperly colored the jury's perception of other witnesses' testimony ignores that Slavin's testimony *was not admitted for substantive or credibility purposes*. The court admitted Slavin's testimony for the limited purpose of explaining how the police investigation proceeded, instructed the jurors that his testimony was "not to be used for any [other] purpose," and specifically instructed the jurors that Slavin's testimony should not "in any way . . . affect your individual determination of the credibility of [other] witness[es] as they . . . sat here on the [witness] stand and testified." See *State* v. *L.W.*, 122 Conn. App. 324, 335 n.7, 999 A.2d 5 (court's cautionary instructions relevant to analysis of whether evidence properly admitted), cert. denied, 298 Conn. 919, 4 A.3d 1230 (2010). "We presume that the jury followed the instructions as given." *State* v. *Webster*, 308 Conn. 43, 58 n.11, 60 A.3d 259 (2013). "[I]t is well established that, [i]n the absence of a showing that the jury failed or declined to follow the court's instructions, we presume that it heeded them." (Internal quotation marks omitted.) *Hurley* v. *Heart Physicians, P.C.*, 298 Conn. 371, 402, 3 A.3d 892 (2010). Accordingly, we conclude that Slavin's testimony was not improper commentary on the testimony of other witnesses.

Second, the defendant argues that "Slavin's testimony about what codefendants and other witnesses told police consisted of first level, double, triple and quadruple hearsay." On the contrary, the court did *not* admit Slavin's testimony for its truth, but only to explain "how the police investigation proceeded." "An out-of-court statement *offered to prove the truth of the matter asserted* is hearsay and is generally inadmissible unless an exception to the general rule applies." (Emphasis added; internal quotation marks omitted.) *State* v. *Rosario*, 99 Conn. App. 92, 108, 912 A.2d 1064, cert. denied, 281 Conn. 925, 918 A.2d 276 (2007). Evidence offered for another purpose, however, "is admissible not as an exception to the hearsay rule, but because it is not within the rule." *State* v. *Sharpe*, 195 Conn. 651, 661, 491 A.2d 345 (1985). For instance, "the state may . . . present evidence to show the investigative efforts made by the police and the sequence of events as they unfolded, even if that evidence would be inadmissible if offered for a different reason." *State* v. *Vidro*, 71 Conn. App. 89, 95, 800 A.2d 661, cert. denied, 261 Conn.

935, 806 A.2d 1070 (2002). Here, the state did exactly that. Accordingly, the challenged testimony was not improper hearsay.

The court properly admitted Slavin's testimony for the limited purpose of explaining how the police investigation proceeded.

### III

The defendant's fifth and final claim is that the court improperly penalized him with a longer sentence for electing to go to trial, as revealed by the court's remarks at sentencing.

The following additional facts and procedural history are relevant to this claim. Before being sentenced, the defendant addressed the court to explain that although "I do accept responsibility for my actions [insofar as] . . . I feel that if I was living a better life in 2010, I wouldn't be sitting right here. [Nevertheless] I did not shoot [the victim]. I didn't do it. What I did was see what happened and didn't say anything, when the police questioned me . . . [a]nd I guess that's the reason why I'm sitting here today because . . . I was the first person they questioned in this case, [and] if I [had] told the truth [about] what happened [then] the prosecutor wouldn't be over there saying [I] deserve the maximum, she would have been offering me a deal like she was offering Bugg to lie . . . [at] my probable cause hearing. And I would be free in—in another five years, maybe. . . . But since I didn't say anything this is what I have to—this is what I have to live with. . . . Once again, I'm sorry, for y'all loss, but the facts . . . of the matter, Your Honor, [are that] on these five counts . . . I'm innocent."

After briefly addressing the victim's family, the court addressed the defendant: "Anthony Collymore, your actions on the night of January 18th, 2010, were completely random, totally senseless and just vicious in nature. You shattered [the victim's] family, left them with a loss that will linger with them forever. Your actions clearly demonstrate total indifference to the laws of our society and a complete disregard for others.

"*Furthermore, you are still unwilling to accept full responsibility for your actions.* I cannot get inside your mind to determine your motives that night to commit such a senseless act. You should have known that the decisions that you took that night were going to lead to a tragic end, and they did." (Emphasis added.) The court concluded by noting the defendant's lengthy, violent criminal record.

At the outset, we note that this unpreserved claim by the defendant "is reviewable under the first two prongs of *State* v. *Golding*, [213 Conn. 233, 239, 567 A.2d 823 (1989)] because: (1) the record is adequate for review as the trial court's remarks during sentencing are set forth in the transcripts in their entirety; and (2)

the claim is of constitutional magnitude, as demonstrated by the defendant's discussion of relevant authority in his main brief." (Footnote omitted.) *State* v. *Elson*, 311 Conn. 726, 756, 91 A.3d 862 (2014). We thus turn to the third prong of *Golding*, to determine whether "the alleged constitutional violation . . . exists and . . . deprived the [defendant] of a fair trial." (Internal quotation marks omitted.) *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).

As to whether a constitutional violation exists, it is "clearly improper" to increase a defendant's sentence "based on [his or her] decision to stand on [his or her] right to put the [g]overnment to its proof rather than plead guilty . . . ." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Elson*, supra, 311 Conn. 758. Nevertheless, a defendant's " 'general lack of remorse' "; id., 761–62; and " 'refusal to accept responsibility' "; id., 783; for crimes of which he was convicted are " 'legitimate sentencing considerations' . . . ." Id., 761. "[R]eview of claims that a trial court lengthened a defendant's sentence as a punishment for exercising his or her constitutional right to a jury trial should be based on the totality of the circumstances. . . . [T]he burden of proof in such cases rests with the defendant." (Internal quotation marks omitted.) Id., 759.

Here, the defendant argues that the court's comment at sentencing that he was "still unwilling to accept full responsibility for [his] actions" proves that the court improperly lengthened his sentence as punishment for electing to go to trial. We disagree. In context, that language was a comment on the defendant's remarks at sentencing, in which the defendant continued to blame his predicament in large part on his quality of life and on the prosecutor, rather than accept full responsibility for his own actions. In context, the court's remark was proper commentary on the defendant's " 'general lack of remorse' "; *State* v. *Elson*, supra, 311 Conn. 761–62; and " 'refusal to accept responsibility' . . . ."[27] Id., 783; see also *State* v. *West*, 167 Conn. App. 406, 419,     A.3d     (2016) (rejecting similar claim).

The judgment is affirmed.

In this opinion the other judges concurred.

\* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] The defendant was also found guilty of a second count of attempted robbery in the first degree in violation of §§ 53a-49 (a) (2) and 53a-134 (a) (4), but the court vacated that finding at sentencing, pursuant to *State* v. *Polanco*, 308 Conn. 242, 245, 61 A.3d 1084 (2013).

[2] The state's ballistics expert noted that a .38 class bullet could be fired from a nine millimeter pistol, a .38 Special revolver, or a .357 Magnum revolver.

[3] See *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86 ("[w]e, therefore, adopt today a rule allowing the substantive use of prior written inconsistent statements, signed by the declarant, who has personal knowledge of the facts stated, when the declarant testifies at trial and is subject to cross examination"), cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).

[4] The multiple, overlapping nature of these witnesses' testimony requires

a more detailed presentation of the facts than is ordinarily necessary.

[5] The following colloquy occurred during defense counsel's questioning of Oliphant:

"[Defense Counsel]: Now, you testified at the trial that you felt guilty, that—you felt guilty about Vance Wilson. Can you explain that?

"[The Witness]: I plead the fifth. . . .

"[Defense Counsel]: You indicated during your direct testimony that you felt guilty. What was that reference?

"[Oliphant's Counsel]: He took the fifth amendment to that question."

[6] The sixth amendment rights to compulsory process and to present a defense are made applicable to the states through the fourteenth amendment's due process clause. *State* v. *Andrews*, 313 Conn. 266, 272 n.3, 96 A.3d 1199 (2014).

[7] Although the defendant argues in his brief that the state's conduct violated both the federal and state constitutions, he has provided no independent analysis under the state constitution, as required by *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992), and so we limit our review to the federal constitutional claim. See *State* v. *Allen*, 289 Conn. 550, 580 n.19, 958 A.2d 1214 (2008).

[8] At trial, the state never specified by what authority it immunized the three witnesses. The state asserts on appeal, however, that it relied on § 54-47a for Bugg and Oliphant. As to Vance, the state argues that the record of his immunity is inadequate to review, but argues in the alternative that its grant of immunity to Vance was proper, citing a § 54-47a case, *State* v. *Giraud*, 258 Conn. 631, 635 n.3, 638, 783 A.2d 1019 (2001). At no point before the trial court or this court has the state asserted any other source for its authority to immunize witnesses. Accordingly, we confine our review to § 54-47a. See *Furs* v. *Superior Court*, 298 Conn. 404, 411–13, 3 A.3d 912 (2010) (declining to review claim that state has "inherent authority" to immunize witnesses, because it was not raised before trial court).

[9] Here, the state proceeded in the opposite order, first telling the court that it was granting the witnesses immunity and then having the court instruct the witnesses that they could no longer refuse to testify on the basis of their fifth amendment right against self-incrimination.

[10] Because a grant of immunity pursuant to § 54-47a necessarily includes transactional immunity, all three witnesses received such immunity when the state immunized them during its case-in-chief. See *Furs* v. *Superior Court*, 298 Conn. 404, 411, 3 A.3d 912 (2010) ("the General Assembly intended to provide both transactional and derivative use immunity to witnesses compelled under the statute to testify"). Section 54-47a also confers use and derivative use immunity, meaning that, in addition, the state cannot use testimony compelled under § 54-47a—or evidence found as a result of that testimony—to prosecute the witness for another offense about which the witness did not testify. See id.; but see *Cruz* v. *Superior Court*, 163 Conn. App. 483, 490 n.5, 136 A.3d 272 (2016) (treating use and derivative use immunity as wholly contained subset of transactional immunity).

[11] For its part, the trial court never explicitly stated whether it viewed the issue as one of revoking existing immunity or granting additional immunity, but its comments suggest that it took the latter view.

[12] At oral argument before this court, the defendant did argue that trial counsel was barred during cross-examination in the state's case-in-chief from asking certain questions, as they were beyond the scope of the state's direct examination, then barred from asking those same questions during the defense case-in-chief because the witnesses asserted their fifth amendment rights, and that this sufficed to show that the defense was denied essential testimony. We disagree, for two reasons.

First, as a legal matter it is not potentially exculpatory questions but actually exculpatory answers that the defendant must show to sustain his burden under the effective defense theory. See *United States* v. *Triumph Capital Group, Inc.*, 237 Fed. Appx. 625, 629–30 (2d Cir. 2007) (questions alone not sufficient); see also *United States* v. *MacCloskey*, supra, 682 F.2d 475–77, 479 (reversing conviction where witness *had* previously answered questions during voir dire outside jury's presence and answers were detailed and exculpatory). Here, we cannot speculate as to what the answers to the defendant's questions might have been. See *New Hartford* v. *Connecticut Resources Recovery Authority*, 291 Conn. 502, 510, 970 A.2d 578 (2009) ("speculation and conjecture . . . have no place in appellate review" [internal quotation marks omitted]).

Second, as a factual matter, even if we could speculate as to the answers to the questions that were asked, we would conclude that such testimony

was cumulative or otherwise obtainable because, here, the witnesses did answer the vast majority of questions at some point during the trial, and the only questions that remained unanswered were highly tangential to the actual issues at hand. See part I B 2 of this opinion.

[13] We note that the state, in its brief, did not address the defendant's argument that the court improperly sustained these witnesses' invocation of their fifth amendment rights.

[14] As to the three new questions, the court's failure to compel Bugg, Vance, and Oliphant to testify did not violate the defendant's constitutional rights because the witnesses asserted a valid fifth amendment right. See *State* v. *Simms*, 170 Conn. 206, 209–10, 365 A.2d 821 (in conflict between witness' fifth amendment right against self-incrimination and defendant's right to compulsory process, fifth amendment right prevails), cert. denied, 425 U.S. 954, 96 S. Ct. 1732, 48 L. Ed. 2d 199 (1976).

[15] The defendant also claims, as a procedural matter, that the court erred by not individually assessing whether each question implicated the witness' fifth amendment right to remain silent, and instead permitting a "blanket" assertion of that right. We do not address this claim because we conclude that, even if the procedure was improper, these questions did not implicate the fifth amendment.

[16] As to these questions, the court's failure to compel Bugg, Vance, and Oliphant to testify did not violate the defendant's constitutional rights because the same testimony already had been presented during the state's case-in-chief, and the defendant has identified no compelling tactical reason why that testimony needed to be repeated in the defense case-in-chief. See *State* v. *West*, 274 Conn. 605, 624–25, 877 A.2d 787 ("[t]he federal constitution require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense . . . [which is] in plain terms the right to . . . present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies" [internal quotation marks omitted]), cert. denied, 546 U.S. 1049, 126 S. Ct. 775, 163 L. Ed. 2d 601 (2005).

[17] The defendant argues that this error was structural and thus not subject to harmlessness analysis. We disagree. "[W]e forgo harmless error analysis only in rare instances involving a structural defect of *constitutional magnitude.* . . . Structural defect cases defy analysis by harmless error standards because *the entire conduct of the trial, from beginning to end, is obviously affected* . . . ." (Emphasis altered; internal quotation marks omitted.) *State* v. *Artis*, 314 Conn. 131, 150, 101 A.3d 915 (2014). "[S]tructural defect cases contain a defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself. . . . Such errors infect the entire trial process . . . and necessarily render a trial fundamentally unfair . . . . Examples of such structural errors include, among others, racial discrimination in the selection of a grand jury or petit jury and the denial of a defendant's right to counsel, right to a public trial, or right to self-representation." (Citations omitted; internal quotation marks omitted.) Id., 151. Here, the court's various *evidentiary rulings* improperly excluding testimony that the jury had already heard neither were an error of *constitutional* magnitude nor "infect[ed] the entire trial process . . . necessarily render[ing] [the] trial fundamentally unfair . . . ." (Internal quotation marks omitted.) Id.

[18] The fifth count of the information, which charged the defendant with criminal possession of a firearm in violation of § 53a-217 (a) (1), alleged that "on or about January 18, 2010, at approximately 9:42 p.m., at or near [Diamond Court, the defendant] possessed a firearm and had been convicted of a felony."

[19] See footnote 18 of this opinion.

[20] The defendant was charged with two counts of attempted robbery in the first degree in violation of §§ 53a-49 and 53a-134, one count of conspiracy to commit robbery in the first degree in violation of §§ 53a-48 and 53a-134, and one count of felony murder with a predicate felony of robbery.

[21] The court instructed the jury that it could use the testimony about January 9, 2010, only to assess Oliphant's credibility, not for substantive purposes. The defendant argues that the jury would have ignored this clear instruction and instead used the evidence substantively. "[I]t is well established that, [i]n the absence of a showing that the jury failed or declined to follow the court's instructions, we presume that it heeded them." (Internal quotation marks omitted.) *Hurley* v. *Heart Physicians*, *P.C.*, 298 Conn. 371, 402, 3 A.3d 892 (2010). Nevertheless, in determining whether evidence is more prejudicial than probative, a court must assess the risk that a jury will ignore such instructions and use evidence for an improper purpose.

See *State* v. *Busque*, 31 Conn. App. 120, 124–25, 129–32, 623 A.2d 532 (1993) (reversing conviction where evidence was such that jury likely used it for improper purpose, despite court's clear instruction), appeal dismissed, 229 Conn. 839, 643 A.2d 1281 (1994). Because the defendant here does not challenge the admission of the January 9 gun possession testimony to the extent that the jury properly used it to assess Oliphant's credibility, in our analysis of harmlessness we consider the risk that the jury improperly used that testimony for substantive purposes.

[22] See Conn. Code Evid. § 8-3 ("[t]he following are not excluded by the hearsay rule . . . [1] . . . [a] statement that is being offered against a party and is . . . [D] a statement by a coconspirator of a party while the conspiracy is ongoing and in furtherance of the conspiracy").

[23] The defendant also argues that Foote's testimony was improper hearsay. We disagree. "An out-of-court statement *offered to prove the truth of the matter asserted* is hearsay and is generally inadmissible unless an exception to the general rule applies." (Emphasis added; internal quotation marks omitted.) *State* v. *Rosario*, 99 Conn. App. 92, 108, 912 A.2d 1064, cert. denied, 281 Conn. 925, 918 A.2d 276 (2007). Evidence offered for another purpose, however, "is admissible not as an exception to the hearsay rule, but because it is not within the rule." *State* v. *Sharpe*, 195 Conn. 651, 661, 491 A.2d 345 (1985). Here, the court twice instructed the jury that the evidence was admitted solely for impeachment. "It is a fundamental principle that jurors are presumed to follow the instructions given by the judge." (Internal quotation marks omitted.) *State* v. *Williams*, 258 Conn. 1, 15 n.14, 778 A.2d 186 (2001).

[24] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."

The sixth amendment right to confrontation is made applicable to the states through the due process clause of the fourteenth amendment. See, e.g., *Pointer* v. *Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965).

[25] The defendant argues that this testimony violated his "right to have his jury determine issues of credibility and fact" and that this "state[s] [a claim] of constitutional magnitude." Although he does not specify under what provision of the constitution he asserts this right, we gather from the cases he cites that it is essentially a "fair trial" claim under the due process clause of the fourteenth amendment to the United States constitution, which provides in relevant part: "nor shall any State deprive any person of life, liberty or property, without due process of law . . . ."

[26] Although Slavin did testify, in one instance, to the out-of-court statement of a nonwitness, we conclude that the defendant waived any challenge to that testimony. At trial, the state asked Slavin how the police first learned who was involved in the shooting. Slavin began to say that they had received a tip but defense counsel interrupted, objecting "as to what the tip might have been" on the ground that it was hearsay. The state claimed it for its effect on the listener, the court overruled the objection, and Slavin testified that the police "received a tip from a young lady who overheard some people talking on a bus that a party named Rex and Stacks or . . . Dreads were . . . the ones responsible for killing [the victim]." The court then excused the jury and held a sidebar, at which defense counsel asked the court to strike the testimony about "the tip information" but expressly agreed that the state could "ask the question, you heard something, you got a tip, and then as a result of that tip, what did you do. It doesn't have to have what the tip is." The court adopted that position, ruling that Slavin could testify that "the authorities [got] a tip and act[ed] on that" but could not testify that "the tip said (a), (b), or (c)." When the court reiterated that the state could ask about "[t]he fact . . . [that police] got a tip," the state asked, "[b]ut that's where the objection would l[ie] for [defense counsel]," and the court replied: "That's not what I heard. What I heard was, the issue was with respect to the *content* of the conversation from someone outside of the authorities. Am I correct in that?" (Emphasis added.) Defense counsel replied, "Yes." The court then brought the jury back into the courtroom, instructing the jurors that it was striking the testimony they had heard about the tip and that although Slavin would be testifying about what others had said, such testimony was "not to be used for any purpose other than how the police reacted to those responses . . . to give [jurors] the context of the police investigation." The state then elicited the following testimony from Slavin:

"Q. Okay. And now you indicated that at some point in time a tip came into the Waterbury police?"

"A. Yes.

"Q. And when was that?

"A. It was on, I believe, January 28th, 2010.

"Q. Okay. And based on that tip, what did you do?

"A. Based on that tip, the—the names that I had to work with, the nick-names—we have a database of nicknames, street names, that we've been compiling—particularly another sergeant and I—since—for almost ten years now. We had those nicknames in this list, and the nicknames came out to be Stacks, which would be [the defendant], and Rex or Dreads, which turned out, we believed, to be Mr. Oliphant—Jabari Oliphant."

Defense counsel did not object to this testimony. Against this background, "[w]e deem this claim waived, and, therefore, we decline to review it." *State* v. *Phillips*, 160 Conn. App. 358, 369, 125 A.3d 280, cert. denied, 320 Conn. 903, 127 A.3d 186 (2015).

[27] On several of his claims, the defendant also asks this court to invoke its supervisory powers to reverse the judgment of the trial court and remand the case for a new trial. We decline to do so. "The exercise of our supervisory powers is an extraordinary remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Lockhart*, 298 Conn. 537, 576, 4 A.3d 1176 (2010). This is not such a case.

Finally, the defendant asks this court "to review the sealed exhibit [submitted to the court at trial, containing the personnel files of several detectives who testified] and [to] grant appropriate relief." (Citation omitted.) The state does not dispute the propriety of such review, but argues that "unless the sealed exhibit contains information . . . so compelling that it could have impacted the outcome at trial," the court did not abuse its discretion in denying the defendant's request for those files. At trial, the court agreed to review the files to determine whether any information in them should be disclosed to the defendant. It appears that no such information was disclosed. We have reviewed the sealed files ourselves and conclude that the court did not abuse its discretion in denying the defendant's request.

————————————————